CCL, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 97–721C.

United States Court of Federal Claims.

Dec. 23, 1997.

Joseph J. Petrillo, Washington, DC, argued for plaintiff. With him on the briefs were Karen D. Powell and William E. Conner, of counsel.

Elizabeth C. Coombe, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, argued for defendant. With her on the briefs were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Joseph A. Kijewski, Assistant Director.

## OPINION

BRUGGINK, Judge.

This is an action brought pursuant to the court's bid-protest jurisdiction. *See* 28 U.S.C.A. § 1491(b)(1) (West Supp.1997). The computer maintenance services at issue here were, until the end of September 1997, being performed by the protestor CCL at a Denver facility under a contract with the Defense Information Systems Agency (DISA).[1] They are now being performed by BDM International[2] as a result of a modification of a separate contract. BDM acquired its work without competition and CCL contends that this violated the Competition in Contracting Act (CICA)[3] and the Brooks Act.[4] Pending are CCL's motion for partial summary judgment and the government's cross-motion to dismiss or for summary judgment. Oral argument was held December 17, 1997. For the reasons set forth below, the court grants CCL's motion for partial summary judgment.[5]

## BACKGROUND

Sometime in 1989, the Department of Defense (DoD) undertook a complete restructuring of its information-technology systems. This was necessary because existing computer facilities were obsolete, scattered, not interoperable, inefficient, ineffective, and difficult to use. The DoD's rationale and intentions were set forth in a series of De-

---

1. There is confusion in the record regarding which government entity awarded the contract. At oral argument, however, the government clarified that the contract was awarded by the Defense Information Services Organization(DISO), the predecessor entity to DISA. Plaintiff accepted this representation as true.

2. BDM International is also listed in some contract documents as BDM Federal.

3. 10 U.S.C. § 2304 (1994).

4. 40 U.S.C. § 759 (1994) (repealed). The act was repealed on February 10, 1996. *See* Pub.L. No. 104–106, § 5101, 110 Stat. 680 (1996).

5. Because of the expedited nature of the proceedings, the court ruled at oral argument. The court's ruling was memorialized in a separate order dated December 18, 1997.

fense Management Report Decisions (DMRD). Most relevant are DMRDs 924 and 918. DMRD 924, apparently issued in draft form on November 10, 1989,[6] initiated a consolidation of existing and dispersed computer facilities throughout DoD into information processing centers (IPCs) operated within various DoD services and agencies. Various options for consolidation were explored in DMRD 924, but the one selected was an intra-agency consolidation of computing workloads into IPCs that would be operated by a service or agency, but which would not be used by other services or agencies.

In September 1992 the consolidation effort was expanded by DMRD 918, which called for further consolidating across service and agency boundaries the various IPCs (created pursuant to DMRD 924) into centralized "Defense MegaCenters." DMRD 918 also called for the creation of the Defense Information Systems Agency (DISA),[7] which was appointed to operate and manage the new Defense MegaCenters. Sixteen such Mega-Centers were ultimately created pursuant to DMRD 918 and are located at various Army, Navy, and Air Force bases throughout the country. Responsibility for operating and maintaining the sixteen MegaCenters was transferred to DISA in October 1993.

As discussed in more detail below, BDM was originally awarded a contract in February 1993 by the Air Force pursuant to the earlier DMRD 924. At that time, DMRD 918 was already in existence. This contract required BDM to consolidate forty-four existing Air Force Logistics Command computer facilities into six IPCs, and to supply and maintain the necessary computer and related equipment. In October 1994, however, BDM's contract was expanded pursuant to

DMRD 918 by contract modification P00039 to encompass all sixteen of the newly created Defense MegaCenters, not just the six originally identified Logistics Command sites.

While BDM was performing its basic contract, CCL was awarded two contracts for computer equipment or services, one by the Army and one by DISO. CCL's Army contract covered maintenance work at four Army IPCs (which later became Defense MegaCenters pursuant to DMRD 918). CCL's Air Force contract, awarded in 1995, required CCL to supply and maintain a computer and related equipment at the Denver MegaCenter, which had previously been operated by DISO. The instant dispute arose when CCL learned that DISA had decided not to exercise its option to renew its Denver contract but instead ordered BDM to perform the same work.[8]

## A. The BDM Contract

### 1. Internal Agency Procedures

In order to meet the goals established by DMRD 924 with respect to the Air Force (and before DMRD 918 existed), Air Force Headquarters directed the Air Force Logistics Command, the Air Force Communications Command, and the Air Force Systems Command to "plan, manage, and implement consolidation of AFLC's 44 wholesale logistics systems onto 8 large mainframes...." (R. at 365.) Logistics Command accordingly performed a requirements analysis in which it proposed to consolidate the "Wholesale Logistics Systems currently being processed on 44[IBM] or IBM Compatible Computer platforms in 8 or less IBM/IBM Compatible Computer platforms at the 6 AFLC sites." (R. at 18.) The six sites were: "WPAFB [Wright Patterson Air Force Base], OC–ALC

---

6. The copies of DMRD 924 in the administrative record appear to be incomplete. The government informed the court at oral argument that this is so because DMRD 924 was "an ongoing process." The parties agree, however, that DMRD 924 only called for consolidation of automatic data processing (ADP) equipment within a particular service or agency.

7. DISA was also assigned the responsibilities of DISO, which was merged into DISA in the fall of 1993.

8. CCL alleges in its complaint that another contract it holds for maintenance at four Army MegaCenters will suffer the same fate when its term expires at the end of the year. The government argues that the issue is not yet ripe. At oral argument, the court was informed that DISA intends to renew CCL's Army contract, which, according to the government, would render the issue moot. This opinion does not address CCL's Army contract, an issue the court will take up later.

[Oklahoma City Air Logistics Center], OO–ALC [Ogden Air Logistics Center], SA–ALC [San Antonio Air Logistics Center], SM–ALC [Sacramento Air Logistics Center], WR–ALC [Warner–Robins Air Logistics Center]." (R. at 37.) In addition, the Aerospace Guidance Metrology Center and Cataloging and Standardization Center were to be "re-hosted" and merged into Wright–Patterson Air Force Base, as were the workloads at four off-base Contractor Development Facilities located at BDM International, Computer Sciences Corporation, Grumman Corporation, and Martin Marietta Data Systems.[9] (See R. at 18–19.) Finally, Logistics Command concluded that the proposed consolidation "is proven feasible by the Performance Measurement Results...." (R. at 22.)

Logistics Command proceeded to implement Headquarters' directive by developing a plan and specifications for Request for Proposal No. F33600–92–R–0018 (as amended) (RFP). A source-selection plan was prepared. It explained the background of the procurement:

On 11 November 1989, the Deputy Secretary of Defense directed a study to examine the savings that might be achieved by consolidating/collocating Automated Data Processing (ADP) operation and design activities.... The Program Management Directive for USAF Consolidation of ADP Operations and Design Centers (PMD2208) directs the AFLC Program Manager (PM) to plan, manage, and implement the AFLC Consolidation of ADP Operations in accordance with (IAW) the HQ USAF Plan. The AFLC Logistics Management System Center (LMSC) DMRD 924 PMO, LMSC(I)/SN(1), was directed to manage AFLC's portion DMRD 924. The operational environment consists of nine Air Force (AF) Information Processing Centers (IPC) located at Wright–Patterson Air Force Base (WPAFB), Ohio; Tinker AFB, Oklahoma; Hill AFB, Utah; McClellan AFB, California; Kelly AFB, Texas; Robins AFB, Georgia; Cataloging and Standardization Center (CASC); Aerospace Guidance and Metrology Center (AGMC); and, Aerospace Maintenance and Regeneration Center (AMARC). This initiative will eliminate the IPCs at AGMC, CASC, and AMARC. At least one computer will be installed at WPAFB and each of the five Air Logistics Centers (ALC). The Contractor will provide and install new equipment and integrate new and existing equipment that is not replaced.

(R. at 63.)

Also according to the source-selection plan, a market survey was conducted by placing the following synopsis in the *Commerce Business Daily*:

The Air Force intends to procure a basic one year indefinite quantity (IDQ) contract with four one year options by means of formal source selection procedures for technical and management services and required hardware CPUs and peripherals to consolidate the Air Force Logistics Command's (AFLC) automated date processing (ADP) systems as directed by Defense Management Review Decision (DMRD) 924. This acquisition will require the contractor to migrate the application of approximately 20 million lines of code from more than 40 AFLC IBM compatible mainframe systems located at Wright–Patterson AFB OH and local contractor development facilities, Tinker AFB OK, Hill AFB UT, McClellan AFB CA, Kelly AFB GA, Newark AFB OH and Battlecreek MI to a consolidated and reduced number of ESA capable mainframes at the first six sites of the eight shown above; migrate application software to function under a minimal number of copies of the application software to function under a minimal number of copies of the operating system on each consolidated mainframe; perform selective application program conversions; perform technical tasks to optimize system performance; provide hardware and system software maintenance for consolidated equipment configuration environments; provide equipment and software training for Information Processing Centers (IPC) personnel and provide interim operation services as required. All hardware and software will be off-the-shelf commercial products. No hardware or application software devel-

---

**9.** These five facilities ceased to exist separately after being "re-hosted" to Wright–Patterson AFB.

opment will be procured through this effort. It is anticipated that this will be a compatibility limited acquisition.

(R. at 65.) There were sixty-eight responses to the synopsis; a draft RFP was released in November 1991; and industry comments were received in late November and incorporated into the final RFP. Notice of procurement was published in the *Commerce Business Daily* on November 29, 1991, describing the acquisition in the same language as quoted above.

### 2. *Brooks Act Authority for the Logistics Command Consolidation*

The Brooks Act was still in force at the time of this procurement, and so the Air Force sought and received on February 10, 1992, a delegation of procurement authority (DPA) from the General Services Administration (GSA) for information-technology resources.[10] That grant was premised on an agency procurement request (APR) requesting authority to consolidate forty-four different computer systems into eight large systems within the Logistics Command. (*See* R. at 3, 98.) In the cover letter to the APR, the DMRD 924 program manager described the APR as "for AFLC's part of DMRD 924...." (*Id.* at 3.) The APR named six sites at which the new systems would be located: Wright–Patterson AFB, Ohio; Tinker AFB, Oklahoma; Hill AFB, Utah; Kelly AFB, Texas; McClellan AFB, California; and Robins AFB, Georgia. These six sites represented all of the planned information-processing sites within Logistics Command.

The initial DPA gave the Air Force authority to acquire "Federal Information Processing (FIP) resources to be acquired as part of the Consolidation of ADP Operations and Design Centers at the Air Force Logistics Center located at Wright–Patterson Air Force Base, Ohio." (*Id.* at 97.) The DPA was granted "[b]ased on the information and certification contained in the APR...." (*Id.*) It also stated in relevant part:

An amendment to this DPA must be obtained whenever any material change is expected from the basis on which the DPA was issued. Examples of such changes include a substantive revision in the technical requirements, a change in the acquisition strategy ... [or] a change in the position, title, or organizational identity of the official authorized to conduct the acquisition....

(*Id.* at 98.) The DPA[11] was redelegated to the Logistics Command on February 11, 1992, for "consolidating information processing operations and design centers in AFLC." (*Id.* at 102.)

### 3. *Request for Proposal No. F33600–92–R–0018*

Eventually, on April 7, 1992, the RFP was released. It included an attached Statement of Work containing a detailed description of the work to be accomplished under the contract. The different sections of the Statement of Work are briefly summarized below. Paragraph I of the Statement of Work explains the purpose of the procurement as follows:

Defense Management Reviews (DMR) identify opportunities to reduce Department of Defense (DoD) costs. Subsequent Defense Management Report Decisions (DMRD) direct implementation of certain DMR recommendations. DMRD 924 calls for consolidation of Information Processing Centers (IPC) and modernization of communications-computer equipment throughout DoD. Modernization of system software is directed by DMRD 931. This Statement of Work (SOW) effort addresses requirements related to implementation of both DMRD 924 and DMRD 931 for IBM/IBM compatible systems at the IPCs listed in Paragraph 2.0. For purposes of supporting the phases of the DMRD and the Corporate Information Management (CIM) initiative, the Contract will furnish equipment, software, and technical services at DoD installations in support of the current Air Force Logistics Command

10. At the time the BDM contract was let, the Brooks Act required agencies to obtain delegations of procurement authority from GSA to purchase information-technology equipment.

11. This DPA was referred to by the Air Force as the "924 DPA." (R. at 103.)

(AFLC), Air Force Systems Command (AFSC), the new Air Force Material Command (AFMC), and other DoD agencies.[12] (R. at 502.)

Paragraph 2 describes the sites affected by the project. They are consistent with the sites identified in the requirements analysis:

a. 1881st Communications–Computer Systems Group ... OO–ALC, Hill AFB, UT 84056

b. 1923rd Communications–Computer Systems Group ... SA–ALC, Kelly AFB, TX 78241

c. 1926th Communications–Computer Systems Group ... WR–ALC, Robins AFB, GA 31098

d. 1985th Communications–Computer Systems Group ... OC–ALC, Tinker AFB, OK 73145

e. 2046th Communications–Computer Systems Group ... Wright Patterson AFB, OH 45433

f. 2049th Communications–Computer Systems Group ... SM–ALC, McClellan AFB, CA 95652

g. Aerospace Guidance and Metrology [sic] Center (AGMC) Newark AFB, OH 43055

h. BDM International, Inc.

i. Computer Sciences Corporation (CSC)

j. Grumman Data Systems Division

k. Martin Marietta Data Systems

(R. at 503–04.)

Paragraph 3, entitled "Overview," states that "[t]he Air Force Materiel Command (AFMC) production environment is constantly evolving; therefore, the most current information regarding equipment and software will be listed in the appropriate Site Annexes...." (R. at 505.) The site annexes, which provide an updated list of equipment at each location, were included in the solicitation but were not produced in their entirety as part of the administrative record.

The remaining sections of the Statement of Work describe the contract's substantive requirements, technical and otherwise. For instance, paragraph 4 details the contractor's management and planning obligations in performing the contract, including personnel, security, and training issues. Paragraph 5, entitled "Initial Requirements," requires "[c]onsolidation of IBM ... computers from 40-plus to a minimum of one each at WPAFB, OC–ALC, OO–ALC, SA–ALC, SM–ALC and WR–ALC...." (R. at 530.) It also lists as tasks "[a]cquisition of equipment," "[c]onsolidation of operating system images, application workloads, command-wide ... networks," "[i]nstallation of Government furnished MVS/ESA and migration of all workload to the new equipment," "[i]ntegration of system security capabilities," "[t]raining of Government personnel in new hardware, software and procedures," "[t]echnical support at all AFMC IPC locations," and "[r]eplacement of ... [tape and disk storage]." (*Id.*)

Paragraph 6 of the Statement of Work states: "Contractor shall support and maintain all hardware components provided under this Contract and any of the equipment identified in the Site Annexes." (R. at 546.) Paragraphs 7 through 11 address movement of the AGMC and off-base computing workloads onto Wright–Patterson Air Force Base. Paragraph 12 explains the requirement to "replace remaining DASD with 3390 or compatible high density disks." (R. at 572.) Paragraph 13 deals with the replacement of open-reel tape drives. Finally, paragraph 14, entitled "Follow-on Projects," permits the government to "issue an indefinite quantity of delivery orders to assign the Contractor specifically defined tasks ... at each site," including orders to "maintain all hardware and software procured via delivery order under this Contract." (R. at 574.) This paragraph also states: "Government may add or discontinue maintenance services on hardware and software. The annual maintenance fees for delivery order hardware/software shall be the basis for determining incremental/decremental maintenance." (*Id.*)

---

**12.** Although not explicit in the record, the parties informed the court at oral argument that the Air Force Materiel Command is the successor entity to Logistics Command. The terms are synonymous for purposes of this opinion.

4. *Contract No. F33657–93–D–2038*

On February 3, 1993, the Air Force awarded BDM an indefinite quantity/indefinite delivery contract for goods and services pursuant to the RFP. The minimum value of goods and services to be ordered was $15,078,480; the maximum amount was $362,000,000, if the government ordered all possible goods and services under the contract.

The contract line items (CLINs) describe the contract's requirements by reference to specific paragraphs in the Statement of Work described above. Each CLIN incorporates one or more paragraphs of the Statement of Work. However, no CLIN incorporates paragraphs 1, 2, or 3 of the Statement of Work. Thus, CLIN 0001 (in its original form and before any modifications) reads as follows:

THE CONTRACTOR SHALL PERFORM ALL REQUIREMENTS NECESSARY TO CONSOLIDATE INFORMATION PROCESSING CENTERS (IPCS) AND MODERNIZE COMPUTER–COMMUNICATION EQUIPMENT THROUGHOUT THE AIR FORCE MATERIEL COMMAND (AFMC) [in accordance with] STATEMENT OF WORK (SOW) PARAGRAPHS 4 AND 5.

(R. at 1736.) CLIN 0001AA and CLIN 0001AB are very explicit as to where the contract is to be performed:

THE CONTRACTOR SHALL PROVIDE EQUIPMENT, TESTING AND IMPLEMENTATION AT HQ AFMC, WPAFB OH ONLY AND SHALL PROVIDE ALL PLANS, REPORTS & SUPPORT DOCUMENTATION FOR HQ AFMC WPAFB OH, AND THE FOLLOWING AIR LOGISTICS CENTERS (ALCs): OO–ALC HILL AFB UT; WR–ALC ROBINS AFB GA; OC–ALC TINKER AFB OK; SA–ALC KELLY AFB TX; SM–ALC MCCLELLAN AFB CA [in accordance with] ... SOW PARAGRAPHS 4 AND 5.

(R. at 1736–37.) Likewise, CLIN 0001AC and CLIN 0001AD permit the government to require the contractor to provide "equipment, testing and implementation for the five ALCS listed in CLIN 0001 AA above [in accordance with SoW paragraphs 4 and 5]." (R. at 1738.)

Most directly relevant to this dispute is CLIN 0012, pertaining to maintenance of hardware. CLIN 0012 along with sub-CLINS 0012AA and 0012AB enable the government to order monthly maintenance "for hardware listed on Table B–3 [in accordance with] SoW para. 6" at the prices specified in Table B–2. (R. at 1748.) Paragraph 6.1 of the Statement of Work, entitled "Equipment Maintenance," describes the general scope of the maintenance work in these terms:

The Contractor shall support and maintain all hardware components provided under this Contract and any of the equipment identified in the Site Annexes, Attachment 4–14, which is to be retained in the Consolidated Equipment Configuration. The Contractor shall ensure that the performance of each Consolidated Equipment Configuration is fully compatible with the applicable original equipment specification while meeting the response time, down time, and availability requirements.

(R. at 1927.) "Consolidated Equipment Configuration" is defined in the Statement of Work as the computer system resulting from the contract's performance "in the IPC at a given site." (R. at 1892.) Under the heading "Summary of Maintenance," the Statement of Work describes the monthly maintenance as follows:

The basic monthly maintenance shall include the following items at each site:

a. Consolidated Equipment Remedial Maintenance

b. Repair and Replacement of all defective Consolidated Equipment Configuration components maintained by the Contractor

c. Labor, material, and such other expenses, as are necessary, to maintain the Consolidated Equipment Configuration to specified performance levels and system availability of 99.5%.

(R. at 1927.) The hardware listed on table B–3 is limited to hardware located at the six identified sites, namely WPAFB, OC–ALC, OO–ALC, SA–ALC, SM–ALC, and WR–ALC. Finally, under CLIN 0012 the maximum expenditure for all hardware maintenance is $13,500,000.

### 5. Modifications to Brooks Act Delegations of Procurement Authority

In December 1993 the Air Force sought to amend BDM's original DPA to reflect a transfer of GSA procurement authority to DISA in furtherance of DMRD 918. (*Id.* at 105–07.) This APR requested: "that the DPA be transferred from the Air Force to the DISO. Contract administration will remain with the Air Force." (*Id.* at 106.) The APR did not expand the DPA beyond the six originally named sites; it did request that the names be changed to reflect their status as IPCs.[13] The amendment to the DPA was granted on January 28, 1994.

Administration of the BDM contract was subsequently transferred to DISA on June 30, 1994.[14] In May 1994 the Air Force submitted another APR reflecting the transfer of contract administration. The GSA approved the APR and amended the DPA on May 27, 1994.

### 6. Modifications to the BDM Contract

The BDM contract was modified on ninety-five occasions. Of these, the most significant for present purposes is modification P00039.[15] It was prompted by DMRD 918 (discussed above) and DMRD 931 (relating to software), which recommended the further consolidation of computing workloads into "Defense MegaCenters." As envisioned by DMRD 918, Defense MegaCenters would provide "a homogenous, protected, quality defense information infrastructure," centralized under the auspices of the DISA, to serve all components of the DoD. (R. at 348.)

Modification P00039 was issued on October 24, 1994, "to identify all sixteen of the Defense MegaCenters (DMCs) for which supplies and/or services may be ordered under this contract." (R. at 146.) It brought all of the newly created Defense MegaCenters within the scope of BDM's contract—an addition of ten sites to the original six. Specifically, the modification altered the original contract by adding CLINs 0011AG through 0011AR, which allowed the government to order "additional hardware as shown in Table B–1" for ten additional sites: Defense MegaCenters located in Chambersburg, Columbus, Denver, Huntsville, Jacksonville, Mechanicsburg, Montgomery, Rock Island, San Diego, and St. Louis. (*See* R. at 137–40.) In addition, CLIN 0012 was completely revised as follows:

> THE CONTRACTOR SHALL PROVIDE REMEDIAL MAINTENANCE SERVICE WITHIN THE PRINCIPAL PERIOD OF MAINTENANCE (PPM) FOR HARDWARE ORDERED UNDER CLIN 0011 [in accordance with] SOW, PARA 6.

(R. at 141.) A separate sub-CLIN containing the "not to exceed" price for potential maintenance services for each of the ten new Defense MegaCenters was also added. In the case of the Denver MegaCenter, no more than $1,000,000 in maintenance services can be ordered under the contract, as modified; the combined total under CLIN 0012 for such services for all sixteen MegaCenters is $23,500,000—a $10,000,000 increase over the previous "not to exceed" amount for maintenance services at the original six sites.

The modification, in other words, had the effect of potentially expanding the work under BDM's contract beyond Logistics Command to ten new sites drawn from the other services and from the Defense Logistics Agency. Insofar as relevant here, however, that potential lay dormant between October 1994 and September 1997, when DISA issued Delivery Order 211 to BDM.

---

**13.** Thus Hill AFB was referred to as IPC Ogden, UT; Kelly AFB was referred to as IPC San Antonio, TX; Warner–Robins AFB was referred to as IPC Warner–Robins, GA; Tinker AFB was referred to as IPC Oklahoma City, OK; McClellan AFB was referred to as IPC Sacramento, CA; and Wright–Patterson AFB was referred to as IPC Dayton, OH.

**14.** The transfer was effected by BDM contract modification P00029, which transferred contract administration to the Defense Commercial Communications Office, a part of DISO. This office was renamed the Defense Information Technology Contracting Office when DISO became DISA.

**15.** The contract modification contained in P00039 was attempted previously by modification P00034. But P00034 was promptly revoked by modification P00035, apparently due to concerns within the Air Force that the modification might provoke protests.

B. *CCL'S Denver Contract*

On April 20, 1995, CCL was awarded Contract No. F19628–95–D–0001 for "the purchase, installation, maintenance, relocation, technical support, and data of up to seven processor complex(es).... All equipment shall be installed at the Defense Information Services Organization (DISO)-Denver Center ... and/or at DISO–Cleveland Center ... as specified on the individual delivery order."[16] (R. at 256.) The contract was a firm, fixed-price, indefinite-quantity/indefinite-delivery contract, subject to certain minimum and maximum limitations; its value was estimated at $9,478,937. The contract term was described as follows:

> The performance period of this contract shall begin on 6 Jun 95 and shall not exceed 60 months after start of contract performance period for equipment and 96 months after start of contract performance period for maintenance, relocation, and technical support.

(R. at 217.) Simultaneously with being awarded the contract, CCL also received its first order under the contract. The order was for an IBM computer with various upgrades, expanded storage, and peripheral equipment to be shipped to the Denver MegaCenter. It was subsequently modified on June 8, 1995, to delete certain items and add others for a net decrease in value. This order, as modified, reflected the only computer hardware purchased from CCL under the contract. It fulfilled the government's minimum purchasing obligations under the contract.

By separate order, CCL was asked to service and maintain the IBM computer it provided to the Denver MegaCenter on a twenty-four-hour-per-day, seven-day-per-week basis from December 4, 1996, to September 30, 1997. No follow-up order for maintenance services beyond September 30, 1997, was ever issued.

Instead, on September 2, 1997, DITCO— the contract administration arm of DISA—

issued Delivery Order 211.[17] This delivery order directed BDM to perform hardware and maintenance services, pursuant to CLIN 0012 of the BDM contract (as modified), on identified equipment located at twelve of the sixteen Defense MegaCenters. The Denver MegaCenter was among the affected sites, and the delivery order encompassed equipment previously being maintained by CCL. Thus, CCL's contract for maintaining equipment at the Denver MegaCenter was not renewed, and BDM is now performing that work under its contract as modified. BDM's contract expires in February 1998, but BDM can continue to fill orders placed before the contract's expiration date until September 30, 1998. This lawsuit followed.

## DISCUSSION

A. *Jurisdiction*

■ On January 1, 1997, the Administrative Dispute Resolution Act of 1996 went into effect. *See* Pub.L. No. 104–320, 110 Stat. 3870 (1996). Insofar as relevant here, it had the effect of expanding the jurisdiction of this court in the bid-protest arena. *See id.* § 12(a)-(b), 110 Stat. at 3874 (codified at 28 U.S.C.A. § 1491(b) (West Supp.1997)). Defendant argues that the statutory change does not reach CCL's complaint. The court lacks jurisdiction, defendant argues, because the complaint embodies merely a dispute involving contract administration. It suggests that what CCL is challenging is DISA's decision not to place an order under its Denver contract.

Defendant misconceives the nature of plaintiff's claim. The complaint is not directed at the administration of either CCL's Denver contract or BDM's contract. Rather, CCL contends that the DoD violated CICA by expanding BDM's contract beyond its scope without opening up that additional work to competition. Subject to establishing standing, CCL could make such a claim even if it had not already had a contract to per-

---

16. The Cleveland MegaCenter was subsequently closed and does not factor into this dispute.

17. The date of Delivery Order 211 is not in the administrative record but was supplied by the government at oral argument. The order was

subsequently modified on September 22 and October 23, 1997, to remove certain items from the inventory of equipment being maintained and to add others.

form maintenance at the Denver MegaCenter.

The new bid-protest statute authorizes this court to entertain "an action by an interested party objecting to ... any alleged violation of statute or regulation in connection with a procurement...." 28 U.S.C.A. § 1491(b)(1) (West Supp.1997). That is precisely what CCL is doing. There is no question that DISA is procuring services in Denver and that CCL contends that the procurement is in violation of law. The fact that the balance of the new bid-protest statute also permits actions challenging "solicitations for bids or proposals for a proposed contract or to the award or the proposed award of a contract" is irrelevant. The new language permits both a suit challenging government action which is self-consciously a competitive procurement as well as what CCL is claiming here: that DISA is *procuring* goods and services through a process that should have been the subject of competition; and that the failure to compete the procurement is *in violation of law*. The statute is therefore plainly invoked. Accordingly, defendant's motion to dismiss for lack of jurisdiction must be denied.[18]

### B. *Standing*

█ Only "interested parties" may bring actions challenging procurements. *See* 28 U.S.C.A. § 1491(b)(1). Defendant argues that CCL is not such an interested party and therefore lacks standing to bring this action. It urges the court to apply the definition of "interested party" contained in CICA, namely "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by a failure to award the contract." 31 U.S.C. § 3551(2) (1994). Since DISA decided not to compete the challenged services, defendant contends that CCL cannot be "an actual or prospective bidder" and that therefore it is not an "interested party" with standing to sue.

What precisely is CCL's status or position? Although it was a contractor in its own right under the Denver contract, it is not relying on that status. It was not a bidder on the original BDM contract, and because DISA did not proceed through a competitive procurement but rather through a modification to the BDM contract, it follows that CCL could not be a bidder for the Denver work. What CCL claims is that the future work in Denver, as well as the work to be performed in the other facilities brought in by modification P00039, should have been the subject of a solicitation. If it had been, CCL would have competed for some or all of that work. Is that level of interest sufficient under the statute? It is.

The new legislation does not indicate what constitutes an interested party. *See* 28 U.S.C.A. § 1491(b). As defendant suggests, one obvious point of reference is the definition Congress instructed the General Accounting Office (GAO) to employ in its bid-protest jurisdiction: "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2). While it makes sense to use this definition as a means of informing the discussion, it does not follow that it necessarily represents the four corners of potential standing under the new legislation.

Hesitation is warranted for two reasons. The first is obvious. The GAO enforces a different statute. The standing question cannot be divorced entirely from the precise nature of the challenge brought and hence from the jurisdictional waiver. *See Bennett v. Spear,* —— U.S. ——, ——, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997). In this case, the plaintiff is alleging a violation of a statute or regulation in connection with a procurement that should have been the subject of competition. Because the court has jurisdiction to hear such a claim, see 28 U.S.C.A. § 1491(b)(1), the test of standing must be applied in that context.

---

**18.** There was, in any event, precedent for such actions even before the change in the Tucker Act. *See AT&T Communications, Inc. v. WilTel, Inc.,* 1 F.3d 1201, 1205 (Fed.Cir.1993) ("[M]odifications outside the scope of the original competed contract fall under the statutory competition requirement.").

The second reason is that the language enforced by GAO is not identical. The GAO is permitted to hear protests as defined in 31 U.S.C. § 3551(1). The preamble to the GAO definition limits the term to use in connection with contracts, solicitations, or requests for offers. *See* 31 U.S.C. § 3551(2). As explained above, because the language of the Tucker Act contemplates a claim that a procurement *should have been* the subject of competition, there is not a perfect joinder between the GAO's definition of interested party and the Tucker Act's jurisdictional waiver. While as a practical matter there normally will be no difference in the grants of authority, the differences in language warrant some caution about presumptively limiting standing to the GAO definition of "interested party." That is particularly the case in view of Congress's apparent intent to have this court dispense with its historical and somewhat quixotic search for the fictional "implied contract of good faith and fair dealing," which only arose in the presence of a bid. *See W & D Ships Deck Works, Inc. v. United States,* 39 Fed.Cl. 638 (1997). The court notes, in any event, that the GAO definition has been judicially construed to apply to persons who would have submitted a bid if given the opportunity. *See Rapides Regional Med. Ctr. v. Department of Veterans' Affairs,* 974 F.2d 565 (5th Cir.1992).

The thrust of the GAO definition, however, is clearly relevant. The plaintiff must stand in some connection to the procurement, and it must have an economic interest in it. This approach is similar to that applied in connection with the Administrative Procedure Act (APA), 5 U.S.C. § 702 (1994), where the Court has held that, in addition to injury in fact, the complaining party must be "within the zone of interests to be protected or regulated by the statute ... in question." *See Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25

L.Ed.2d 184 (1970). This requirement has its roots in the language of the APA, that the plaintiff be "adversely affected or aggrieved by agency action within the meaning of a relevant statute...." 5 U.S.C. § 702; *see also Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 396–400, 107 S.Ct. 750, 755–57, 93 L.Ed.2d 757 (1987); *National Fed'n of Fed. Employees v. Cheney,* 883 F.2d 1038, 1043 (D.C.Cir.1989).

■ Plaintiff's primary argument here is that the purpose behind CICA—promoting open competition—has been thwarted.[19] The court holds that where a claim is made that the government violated CICA by refusing to engage in a competitive procurement, it is sufficient for standing purposes if the plaintiff shows that it likely would have competed for the contract had the government publicly invited bids or requested proposals. In this case, CCL did have a connection with the procurement. The work that it contends should have been competed was work that it wanted to do. Not only has CCL stated it would likely have submitted a proposal, but it was performing the very work that it alleges DISA illegally diverted to BDM. By not being able to compete, it potentially lost a contract. As the court held in *ATA Defense Industries v. United States,* 38 Fed. Cl. 489, 495 (1997), judicial review of procurement methods should not be thwarted through the wooden application of standing requirements. CCL has standing.

## C. *Procedural Matters*

■ Plaintiff filed a variety of affidavits, demonstrative charts, and other documents in connection with the parties' motions for summary judgment. The government opposes inclusion of these in the administrative record and filed a motion to strike.[20] As the court explained at oral argument, some of the assertions in the affidavits are irrelevant.

**19.** CICA was "designed to increase the use of competition in government contracting and to impose more stringent restrictions on the awarding of noncompetitive—sole source—contracts." H.R. Conf. Rep. No. 861, 98th Cong. 1421, *reprinted in* 1984 U.S.C.C.A.N. 1445, 2109; *see also* 10 U.S.C. § 2304 (1994); 41 U.S.C. § 253; *SMS Data Prods. Group, Inc. v. United States,* 853 F.2d 1547, 1554 (Fed.Cir.1988).

**20.** At oral argument, plaintiff voluntarily withdrew the declaration of Richard Gladstone. In addition, the parties resolved their objections to the demonstrative charts by agreeing on a series of clarifications.

It disagrees, however, with the government's claimed exclusive right to define the administrative record. Some of the materials plaintiff offers were part of the procurement history. In any event, while record review is well-established, so are the exceptions to the rule. *Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 339, 342 (1997) (citing *Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir.1989)). Plaintiff cites several that are arguably applicable here, such as an inadequate explanation in the record of agency action, agency consideration of evidence not in the record, or the need for additional evidence to facilitate the court's understanding of the issues. The court observes that the exception especially pertinent here, however, is that the government is being sued for inaction—failing to use the competitive process. *See id.* (noting that extra-record evidence may be considered "in cases where agencies are sued for a failure to take action"). There is less reason to presume that the record assembled by the agency is presumptively complete. Accordingly, the court admits into the record all of plaintiff's proffered documents, with the exception of the newspaper articles, which the court finds irrelevant. In addition, the court admits the proffered affidavits to the extent that they are relevant.[21]

■ A word on the standard of review is also appropriate. Defendant contends that "the appropriate standard is whether the agency's decision that the modification was within the scope [of the original BDM contract] was reasonable." (Def.'s Reply Br. at 7.) This is incorrect. It reflects an inappropriate syncretism between two of the four grounds of reversal contained in the APA, 5 U.S.C. § 706. *See also* 28 U.S.C.A. § 1491(b)(4) (incorporating APA standards of review). The court is to review agency action to determine if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

These inquiries are in the alternative. The agency's application of the law[22] is not viewed through the prism of one of the other inquiries. The agency's action was either lawful or not. If the action was prejudicially unlawful, it does not matter that the agency's perception that its conduct was lawful is reasonable. Hopefully an agency would always act pursuant to reasonable views of what the law permits.

### D. Competition in Contracting Act—Modifications Beyond the Scope

■ The heart of plaintiff's case is that the government violated CICA by procuring goods and services from BDM without either the necessary competition or findings excusing competition. CICA makes "full and open competition through the use of competitive procedures" the central theme of government procurement. 10 U.S.C. § 2304(a)(1)(A). That requirement cannot be avoided by using the device of contract modification. *See AT&T,* 1 F.3d at 1204. Contract modifications may not materially depart from the scope of the original procurement; otherwise the modification prevents the complaining party (and other potential bidders) from competing for what is, in reality, a new and different contract. *See GraphicData, LLC v. United States,* 37 Fed.Cl. 771, 781–82 (1997).

■ Whether a given modification is within the scope of the original contract is determined by comparing the modified contract with the scope of the competition conducted to achieve the original contract. *See AT&T,* 1 F.3d at 1204. The overall inquiry is "whether the modification is of a nature which potential offerors would reasonably have anticipated." *Id.* at 1207. The inquiry, therefore, is primarily an objective one viewed from the perspective of potential bidders for the first procurement.

---

**21.** It would be too cumbersome to parse the affidavits, paragraph by paragraph and sentence by sentence, for relevance. Instead, the court notes that aside from the declaration of Steven White and the declaration of Robert Nixon, which is limited solely to the issue of whether CCL would have participated in competition for the Denver work, it did not rely on the affidavits in reaching its decision.

**22.** As opposed to its interpretation of it in connection with rulemaking. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984).

The GAO, in *MCI Telecommunications Corp.*, 97–2 C.P.D. ¶ 90, 1997 WL 602194 (Sept. 29, 1997), has had occasion recently to give more detail to the question. In determining whether the modified contract materially departs from the scope of the original procurement, that agency examines changes in the type of work, performance period, and costs as between the original contract and modified contract. *Id.*, 1997 WL 602194, at *6 (citing *Neil R. Gross & Co.*, 69 Comp. Gen. 292, 294 (1990)). The GAO also considers whether the solicitation for the original contract adequately advised offerors of the potential for the type of change found in the modification or whether the modification is of a nature that potential offerors would reasonably have anticipated at the time of the original award. *Id.*

In this case, it is true that the original ceiling for the BDM contract, $362 million, is substantial. It is also true that a great deal of this money remains unobligated. Although the overall ceiling price of the BDM contract remained the same, costs were reallocated among the different CLINs and sub-CLINs. Specifically, the "not to exceed" amount of CLIN 0012 was raised from $13,500,000 to $23,500,000 to accommodate maintenance at the ten additional MegaCenters.[23] The Denver MegaCenter work will probably only be in the range of $100,000. While this is not an insignificant sum, defendant is correct that, compared with the rest of the BDM contract, it is not a substantial addition to the obligated amount. This factor, by itself, would not render the modification improper.

It is also true that the modification did not materially change either the rather lengthy performance period (five years) or the physical nature of work being performed. The performance period remained the same. The work changed from maintaining IBM-compatible computers manufactured by Amdahl to include maintenance of an IBM computer. While there are technical differences between how maintenance is performed on IBM computers and IBM-compatible computers, that fact alone would not render the modification illegal.

The "type" of work, however, and whether other bidders could have anticipated a change in that type, goes beyond merely the physical task itself. In the context of this case, "type" requires an examination of where the work was to be performed, and for whom, and, as defendant urges, the degree of flexibility built into the procurement.

There can be no question that the modification pursuant to which DISA ordered the Denver work from BDM is different from the original contract in two important respects. First, the number of sites at which work can be performed is increased almost threefold, from six to sixteen. Second, the modification increased the number of "client" entities from a single agency within the Air Force to several agencies within DoD across all service boundaries. At some point increases in size of these types alter the contract in kind as well as by degree of work. The bidding public has a right to know the general contours of what is being procured. A contract for installation and maintenance at six Air Force Logistics Command locations is different in scope from a contract for maintenance of computers throughout DoD. In addition to offering larger opportunities, the nature of the work is fundamentally altered. The need to furnish services all over the country and in different agency environments is something that bidders should have known about. Modification P00039 transcended the boundary between permissible and impermissible alterations.

Defendant contends, however, that the original solicitation was so flexible in its wording that bidders should have been on notice of this potential change. It seizes on language contained in the Statement of Work (SoW) accompanying the request for proposal. First, the defendant observes that paragraph 1 of the SoW states "DMRD 924 call for consolidation of Information Processing Centers (IPC) and modernization of communications-computer equipment *throughout DoD.*" This observation is correct, but it is not on point because the scope of DMRD 924

---

**23.** The court further notes that at oral argument the parties were unable to state the actual (as opposed to authorized) increase in the contract's value to BDM as a result of the modification.

is not at issue. Neither Paragraph 1 or any other element of the contract tasks BDM with implementing DMRD 924. The reference is meant merely to orient the reader. It is an explanation of *why* the agency is asking for the later, itemized work.

The record is devoid of any indication that Logistics Command was tasked to implement DMRD 924 with respect to other Air Force components or other defense agencies, and in fact, is laden with evidence to the contrary showing that BDM's contract represented only a fraction of the DMRD 924 consolidation effort. The purpose of the BDM contract, as opposed to DMRD 924, was to consolidate "AFLC's 44 wholesale logistics systems onto 8 large mainframes pursuant to DMRD 924." (R. at 365; *see, e.g.*, R. at 1, 6–7, 18, 63, 503, 782, 1878.) In any event, as defendant admits, DMRD 924 did not call for consolidation across service or agency lines, which was the goal of modification P00039 and DMRD 918.

Defendant places its greatest reliance on the following language in paragraph 1 of the SoW: "the Contract will furnish equipment, software and technical services at DoD installations in support of the current Air Force Logistics Command ... and *other DoD agencies.*" (*See* Def.'s Mot. to Dismiss at 29.) According to defendant, this shows the possibility of work at sites other than those which would result from the Air Force consolidation process. It does not. The quoted language only means that the equipment, etc., to be furnished at the installations will support "other DoD agencies," not that the equipment, etc., will be furnished to "other DoD agencies." The interpretation urged by defendant is not only grammatically untenable, but contrary to every other description of the work called for by the contract.

To illustrate, the sentence preceding the cited sentence provides "[t]his Statement of Work (SoW) effort addresses requirements related to implementation ... at the IPC's listed in Paragraph 2.0." Paragraph 2.0 describes the affected sites as the same six Air Logistics Centers referred to throughout the administrative record, as well as the other five sites that were consolidated into Wright–Patterson AFB (the off-site Contractor Development Facilities and the Aerospace Guidance and Metrology Center).

Other documents related to the procurement also show that BDM's contract was limited to six Logistics Command sites. Logistics Command explained in its Agency Procurement Request that it "will consolidate 44 of its existing Wholesale Logistic's System's ADPE ... into eight large systems at six AFLC locations." (R. at 6.) The agency procurement request to GSA also identified HQ AFLC, OC–ALC, OO–ALC, SA–ALC, SM–ALC, WR–ALC as planned equipment-installation locations. (R. at 4.) On November 29, 1991, Logistics Command published a synopsis in the *Commerce Business Daily* announcing its intention to conduct a competitive procurement for "technical and management services and required hardware CPU's and peripherals to consolidate Air Force Logistics Command's (AFLC) automated data processing (ADP) systems as directed by Defense Management Review Decision (DMRD) 924." (R. at 1.) The synopsis further announced that the contractor will be required to "migrate the application of approximately 20 million lines of code from more than 40 AFLC IBM compatible mainframe systems ... to a consolidated and reduced number of ESA capable of mainframes at the first six sites [HQ AFLC, OC–ALC, OO–ALC, SA–ALC, SM–ALC, and WR–ALC] of the eight shown above" as well as "provide hardware and system software maintenance for consolidated equipment configuration environments." (R. at 1.) Finally, the RFP in separate CLINs likewise specifically named these sites, as did the originally awarded contract. Site annexes were supplied for each of the six sites, and no others. Table B–3 identified the six sites, and no others, as locations for monthly maintenance.

Defendant also argues that, although the contract's initial requirement was to consolidate computers at the six identified sites, the Statement of Work allowed the government subsequently to issue "an indefinite quantity of delivery orders to assign the Contractor specifically defined tasks (or groups of tasks) at each site." (R. at 1955.) But the reference to "each site" clearly limits where the

additional work was to be performed, namely, the six identified sites.

Similarly, defendant's reliance on the following language is also misplaced: "[t]he Air Force Materiel Command production environment is constantly evolving; therefore, the most current information regarding equipment will be listed in the appropriate Site Annexes, Attachments 4–14." (R. at 505.) This merely tells bidders where to look for the most recent information on equipment. It does not expand the number of sites where work is to be performed. Indeed, it confirms that the contract is limited to the Air Force Materiel Command (formerly Logistics Command).

Likewise, SoW paragraph 6.1, which states the "Contractor shall support and maintain all hardware components provided under this Contract and any of the equipment identified in the Site Annexes, Attachments 4–14, which is to be retained in the Consolidated Equipment Configuration," (R. at 546), is unavailing. "Consolidated Equipment Configuration" is defined as the computer system resulting from the contract "in the IPC at a given site." (R. at 517.) Again, nothing in the cited paragraph indicates that work was contemplated beyond the identified sites. Subparagraph 6.1.3.4, also cited by the government, must also be read in this context.

Finally, defendant maintains that modification P00039 only changed the places of delivery, something permitted by Federal Acquisition Regulation 52.243–1. This assertion is unsupportable. The regulation obviously contemplates some inherent flexibility in shifting where work is performed, i.e., by moving it from one place to another. Modification P00039, however, expanded the scope of the contract by *adding* ten sites to the original six—a dramatic increase. The modification also erased the clear boundaries limiting the contract to the Air Force Logistics Command's wholesale logistics system computers. Instead, under the modification BDM could be required to perform work at all of the Defense MegaCenters, not only those associated with the Air Force Logistics Command, but also those belonging to the Army, Navy, and Defense Logistics Agency.

The BDM contract as originally solicited and awarded, thus, was clearly limited to work being performed at six identified Logistics Command sites. Indeed, the GSBCA reached the same conclusion in an earlier protest based on BDM's contract:

This procurement was conducted in furtherance of Defense Management Report Decision (DMRD 924), which "calls for consolidation of Information Processing Centers (IPC) and modernization of computer equipment throughout DoD." The procurement involves the provision of equipment and services affecting Wright–Patterson Air Force Base, five other Air Force Logistics Command Centers, and five other sites.

*Computer Sciences Corp. v. Department of the Air Force*, GSBCA No. 12299–P, 93–3 BCA ¶ 26,054, at 129,511, 1993 WL 126499 (Apr. 7, 1993) (internal citations omitted). A potential bidder on the BDM contract would not have contemplated performing work for all MegaCenters in the DoD.

The court recognizes that there may be a need for flexibility when the government contracts for computer and related equipment, particularly when those contracts will be performed over a number of years. In this case, the BDM contract gave Logistics Command considerable discretion as to the goods and services it could order. The contract is for an indefinite quantity and indefinite delivery. It also preserves for the agency the right to change equipment schedules and therefore the type of maintenance. What defendant proposes here, however, is to take a flexible but structured agreement and turn it into an empty vessel into which it can pour all its future needs. The contract has substantial explicit flexibility; the court declines to imply additional uncertainty as to where the work is done and for what entity it will be performed. To do so would eviscerate CICA.

Defendant's reliance on *Pacific Bell v. NASA*, GSBCA No. 12814–P, 94–3 BCA ¶ 27,067 (June 29, 1994), is unavailing. That decision involved a ten-year contract by NASA for "the acquisition and installation of an integrated voice and data replacement telephone system for Ames Research Center (ARC) at Moffett Field. . . ." *Id.* at 134,869.

The contract contained no geographic limits or prohibitions as to possible expansion. *Id.* at 134,871. In its findings of fact, the GSBCA found that "NASA representatives again emphasized the importance that the capacity of the proposed system be expandable to take on whatever additional services would be required by ARC." *Id.* at 134,869. The contract required the digital telecommunication system (DTS) being installed to have a "minimum expandable connection capacity of 15,000 lines, ports, and trunks combined." *Id.* at 134,870.

Moffet Field was initially shared by NASA and the Navy, but the Navy decided to abandon its use because of base-closure programs. NASA took over responsibility for the areas of Moffet Field formerly occupied by the Navy and modified the telecommunications contract to extend its coverage to the new areas. The modification increased the number of lines by approximately 3000 to a total of 10,000. On these facts, the GSBCA concluded that work added by the modification was within the scope of the original contract. *Id.* at 134,878.

*Pacific Bell* involved an expansion by the same contracting entity at the same site. The present case is thus factually distinct. Logistics Command did not order merely more computers or additional maintenance at IPC's identified in the original contract. Rather, the modification at issue here more than doubled the number of sites and pulled them from separate entities. The possibility of this was not apparent in the original solicitation and contract. There is a material difference between supplying and maintaining computer equipment at six identified IPC's within the Air Force Logistics Command and doing similar work for the entire Department of Defense MegaCenter network.[24]

## CONCLUSION

The court holds that modification P00039 exceeded the scope of the original BDM contract. As ordered by the court on December 18, 1997, plaintiff's motion for partial summary judgment is granted. Delivery Order 211, awarded to BDM International under modification P00039 to Contract No. F33657–93–D–2038, violated CICA. The Defense Information Services Agency is accordingly enjoined from obtaining computer equipment or computer maintenance services for the Denver MegaCenter from BDM under that contract or delivery order.

The court need not address plaintiff's alternative argument that the modification exceeded the agency's delegated authority under the Brooks Act. The government's cross-motion for summary judgment and its motion to dismiss on jurisdictional and standing grounds are denied. Its motion to dismiss on ripeness grounds is reserved for subsequent disposition.

---

**24.** Defendant also cites a Comptroller General decision, *Caltech Service v. General Services Admin.*, B–240726, 92–1 CPD ¶ 94, 1992 WL 15936 (Jan. 22, 1992), and another GSBCA decision, *AT&T Global Business Communications Systems v. Department of the Army*, GSBCA No. 12937–P, 95–1 BCA ¶ 27,379, 1994 WL 706142 (Nov. 22, 1994). These cases, too, are distinguishable. In the former case, a modification to reflect the consolidation of cargo "consolidation and containerization points" (CCPs) resulted in a work increase of 30 percent. The protester was aware of the planned consolidation of CCPs, having even protested the initial RFP for failing to take the planned consolidation of CCPs into account. In the latter case, although the places of performance changed from Army sites alone, to include Navy and Marine Corps sites, the number of sites and the amount of work did not increase.