**MYERS INVESTIGATIVE AND SECURITY SERVICES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 99–780C.**

United States Court of Federal Claims.

Sept. 7, 2000.

---

Lawrence Jeffrey Sklute, Washington, D.C., attorney of record for plaintiff.

Sean Curtis Griffin, Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General David W. Ogden, for defendant. David M. Cohen, Director, and Kirk T. Manhardt, Assistant Director.

## *OPINION*

FUTEY, Judge.

This post-award bid protest case is before the court on the defendant's motion for judgment upon the administrative record and plaintiff's cross-motion for summary judgment. Defendant asserts that its decision to award the two subject contracts on a sole source basis was neither arbitrary nor capricious. Defendant thus avers that it is entitled to summary judgment. Plaintiff counters that defendant's decision to award the subject contracts on a sole source basis was arbitrary and capricious. Plaintiff also asserts that a number of defendant's actions during the procurement process violated applicable procurement law.

### *Factual Background* [1]

This case involves the award by the General Services Administration, Federal Protective Service (hereinafter defendant or GSA) of two one-year contracts to provide armed and unarmed guard services on government owned and leased buildings in the state of Ohio. The first contract provides for uniformed guard services in northern Ohio (northern procurement), while the second calls for uniformed guard services in southern Ohio (southern procurement). Performance on both contracts commenced on October 1, 1999, and shall expire on September 30, 2000.

Prior to October 1, 1999, Allstate Security and Investigative Services, Inc. (Allstate)

---

1. Many of the facts provided in this opinion are recited in an earlier order of the court. *See Myers Investigative & Security Servs., Inc. v. Unit-* *ed States,* 47 Fed.Cl. 288, 297–98 (2000). The court deems it necessary for the purpose of this opinion to repeat these facts.

supplied guard services for federal buildings located in Ohio under a contract with GSA. The second option year of that contract ended on September 30, 1999. Allstate's contract was awarded on a competitive basis under the Small Business Administration's (SBA) 8(a) Program, 15 U.S.C. § 637(a) (1994). The 8(a) Program sets aside contracts for socially or economically disadvantaged contractors. Under the 8(a) Program, SBA enters into a contract with the procuring agency and then subcontracts the work to a small private business. *See* 15 U.S.C. § 637(a); *Hawpe Constr., Inc. v. United States,* 46 Fed.Cl. 571, 573 (2000). According to Mr. Roger Pinnau, the administrative contracting officer (ACO), Allstate consistently performed unsatisfactorily under its contract. This unsatisfactory performance led GSA to forgo renewal of Allstate's contract option and to seek to procure guard services under two separate contracts.[2] This division of guard services was necessary because of GSA's planned reorganization of the Federal Protective Service, Great Lakes Region district, which includes Ohio. This reorganization, which began in July 1999, and will become fully effective on October 1, 2000, created five Federal Protective Service, Great Lakes Region districts where four previously existed, and instituted new financing and accounting codes, office symbols and other administrative changes.[3] The reorganization also divided the Federal Protective Service Ohio district into the northern and southern districts, thereby matching the boundaries of the United States district courts in Ohio.

GSA desired to award the two contracts through SBA's 8(a) Program. Mr. Pinnau attested that in order "[t]o determine the feasibility of an 8(a) procurement, [GSA] conducted a market survey to locate responsible 8(a) firms to perform the contract[s]."[4] Although unclear from the administrative record, it appears GSA commenced the market survey as early as February 1999. As part of the market survey, GSA officials contacted "10–15 eligible firms, spoke with current and past contractors, consulted the GSA's mailing lists, and asked non–8(a) eligible companies for suggestions."[5] Among the companies contacted by GSA were On–Duty Security, Inc. (ODS), McCoy Security, Inc., J.K. Guardian Security, Inc., Eric–Tec Security Agency, Inc. (ETSA), The Diamond Group (Diamond), Unlimited Security, Inc. (Unlimited), Digby's Detective & Security Agency, Inc. (Digby), NCLN20 Professional Services (NCLN20), and others.[6] GSA contacted these firms to determine interest, capabilities and pricing. As part of the market survey, GSA submitted to potential contractors a market research chart that described the category of guard service and included an estimation of hours needed to perform the different categories of work. The chart also included a column for the contractor to provide a price estimate. GSA asked the contractors to submit their price estimates.

A number of companies responded to GSA's market research. On February 18, 1999, ETSA submitted two price estimates for the entire state of Ohio, amounting to $1,312,632 and $1,963,308 respectively. On April 28, 1999, We're Cleaning, Inc. submitted a letter to Mr. Pinnau discussing the desire of ODS, its subsidiary, to secure a guard service contract with GSA under the 8(a) Program. The letter did not include a price estimate, but instead provided an hourly rate of $26.83 for the entire state.

Other firms submitted price estimates for either the northern or southern procurement. On May 13, 1999, Unlimited submitted a price estimate of $3,177,556 for the northern procurement only. At least three companies responded to the southern procurement market research. Diamond, which was not 8(a) certified at the time, submitted a price estimate of $2,940,119 on June 2, 1999. On June 7, 1999, Digby submitted a price estimate of

---

**2.** Aff. of Roger Pinnau, September 28, 1999, Defendant's Motion for Judgment upon the Administrative Record (Def.'s Mot.), Tab 1 at 2.

**3.** *Id.*

**4.** *Id.*

**5.** *Id.*

**6.** *See* Plaintiff's Cross-motion for Summary Judgment (Pl.'s Cross-mot.) Exhibit (Ex.) X at 5; Administrative Record (A.R.), Tab 5 at 3.

$3,112,250. The next day, NCLN20 submitted a price estimate of $3,513,610. GSA officials did not contact plaintiff, a small minority business participating in the 8(a) Program, for either procurement despite its having competed for the prior contract.

According to Mr. Pinnau, an evaluation of the responses to its market survey revealed that only Unlimited and Diamond expressed a timely interest in performing the contracts. As Mr. Pinnau explained:

> GSA–FPS Great Lakes Region did not and does not have the resources necessary for multiple timely competitive 8(a) solicitations, evaluations and awards (given our existing heavy workload). To ensure a timely award and timely contract performance, we first performed market research, and then determined that non-competitive measures must be used for this solicitation, as is provided for by SBA's 8(a) sole source procurement program.[7]

In order to ensure that GSA could procure the contracts on a sole source basis, Mr. Pinnau estimated the total value of each contract based upon Allstate's invoices. According to Mr. Pinnau, Allstate charged only $3.2 million to provide guard services throughout all of Ohio for the entire 1998 Fiscal Year (FY) and invoiced approximately $4.5 million for FY 1999. In addition, Mr. Pinnau attested that the results of GSA's market research fell below $3 million. Therefore, Mr. Pinnau "figured the two new contracts, each of which covered only half of Ohio and lasted only one year, would be worth less than $3 million."[8]

## A. Northern Procurement

On May 28, 1999, GSA issued solicitation number GS05P99GCD0002 to Unlimited, which sought "security guard labor, services and guard-force equipment in and at GSA-controlled and GSA-supported facilities located in northern Ohio."[9] Section A–4 of the solicitation states that the contract is a sole source, non-competed procurement. The so-

licitation described the contract as an indefinite delivery, indefinite quantity, fixed price requirements service contract, and estimated the need for 160,000 guard hours.

By letter dated May 31, 1999, Mr. Pinnau informed Ms. Melinda Edwards of SBA's Office of Program Development that Unlimited expressed an interest in this contract via its response to GSA's market research. Mr. Pinnau recommended that the contract be awarded on a sole source basis, stating that the "anticipated dollar amount . . . is estimated at approximately $2.5 million per contract year."[10] He also informed Ms. Edwards that GSA nominated Unlimited for the contract award. On June 9, 1999, SBA, on behalf of Unlimited, accepted GSA's offer for the northern procurement.

On July 9, 1999, Unlimited submitted a price proposal of $3,287,480 for the 160,000 total estimated hours. On July 15, 1999, Mr. Pinnau issued amendment number seven to the solicitation, which reduced the total estimated guard hours from 160,000 to 146,000, and requested that Unlimited submit a price proposal by July 19, 1999. On July 15, 1999, Unlimited submitted a price proposal of $2,968,140. Incorporated with the proposal was a cover letter addressed to Mr. Pinnau from Mr. Jeffrey Jackson, Chief Executive Officer of Unlimited, which stated, in pertinent part:

> I am submitting the second revision of the cost proposal for the Ohio contract. I hope that it meets your concerns pertaining to the $3 million dollar threshold for this contract. This should be considered as our best and final offer. . . . [11]

GSA eventually awarded the contract to Unlimited.[12]

## B. Southern procurement

On June 2, 1999, Ms. Sandra Dickey, the individual responsible for preparing Diamond's price estimate, spoke with Mr. Pin-

---

7. Compl., Ex. 1 at 5–6.

8. Aff. of Roger Pinnau, Def.'s Mot., Tab 1 at 3.

9. A.R., Tab 3 at 2.

10. *Id.*, Tab 5 at 28.

11. *Id.*, Tab 7 at 1.

12. The administrative record does not identify the contract award date.

nau via telephone concerning GSA's market research chart. During this conversation, Ms. Dickey told Mr. Pinnau that Diamond would not be able to perform the 200,000 guard hours listed on the market research chart for under $3 million. On that same day, Mr. Pinnau sent to Ms. Dickey via facsimile a new market research chart that requested a price estimate for 165,000 security guard hours. Also on that same day, Ms. Dickey, on behalf of Diamond, submitted a price estimate of $2,940,119 for the 165,000 guard hours. A few days later, Mr. Pinnau called Ms. Dickey, informing her that based upon Diamond's price estimate, he would negotiate the contract with Diamond. On June 8, 1999, Mr. Pinnau transmitted to Diamond via facsimile a draft copy of pages A–1 through A–8 of the solicitation, which stated that the solicitation would be issued on June 15, 1999, and that a pre-proposal conference with Diamond would be held later that month.

On June 15, 1999, GSA issued solicitation number GS05P99GCD0003 directly to Diamond, which sought "security guard labor, services and guard-force equipment in and at GSA-controlled and GSA-supported facilities located throughout South Ohio." [13] Section A–4 describes the contract as a sole source, non-competed procurement. The solicitation also describes the contract as an indefinite delivery, indefinite quantity, fixed price requirements service contract, and estimated the need for 165,000 guard hours.

On June 24, 1999, GSA held a pre-proposal conference with Diamond, in which GSA discussed, among other things, changes it would make to the solicitation. GSA was represented at the conference by Mr. Pinnau, Mr. Arthur Dobbs, Contracting Officer, Mr. Stanley C. Difford, District Director, Ms. Alma R. Cabello, Supervisory Program Analyst, and Ms. Sue Peelman, a GSA employee. Ms. Dickey, who attended the conference on behalf of Diamond, attested that Mr. Pinnau "stated that he needed to keep the procure-

ment award below three million dollars because otherwise he would not be allowed to sole source it." [14] She also testified that Mr. Pinnau and Mr. Difford "both stated a couple of times that [t]he Diamond Group should not look at this procurement as a one-year requirement but rather to consider it a long-term relationship that they would continue to sole source to [t]he Diamond Group for many years to come." [15]

By letter dated July 6, 1999, Ms. Jeanette S. Diamond, president of Diamond, contacted Mr. Pinnau, requesting an adjustment of guard hours within the solicitation. Her letter states:

> Please accept this letter as our request for the standard supervisory hours shown on the Schedule "B", be adjusted to reflect 10,000 hours instead of 15,000 hours. This more accurately reflects the current usage and assignment of this category of personnel and still allows for growth. This adjustment will assure that the total value of the contract does not exceed the limitations for this procurement.[16]

On July 8, 1999, GSA issued an amendment to the solicitation, which reduced the guard hours from 165,000 to 155,000, and permitted Diamond to submit another price proposal by July 16, 1999. Diamond submitted a price proposal of $2,987,210 on July 8, 1999. On July 15, 1999, Diamond received its 8(a) certification.

On July 27, 1999, Mr. Pinnau submitted a letter entitled "Notice of Offer for SBA's Non-competitive 8(a) Program" to Ms. Jennie Montgomery of SBA, recommending that the contract be awarded on a sole source basis to Diamond.[17] Mr. Pinnau informed Ms. Montgomery that GSA became aware of Diamond's interest while conducting its market research. Significantly, the letter did not mention any other companies that responded to the market research. He also informed Ms. Montgomery that the anticipated dollar amount "is estimated at approximately $2.5

13. A.R., Tab 1 at 2.

14. Aff. of Sandra Dickey, Pl.'s Cross-mot., Tab F at 3.

15. *Id.*

16. *Id.*, Ex. 7.

17. A.R., Tab 5 at 40–42.

million per contract year ...."[18] On August 6, 1999, SBA, on behalf of Diamond, accepted GSA's offer for the southern procurement. GSA awarded the contract to Diamond on September 14, 1999.

Allstate filed a protest before the General Accounting Office (GAO) sometime in August 1999, contesting both awards. On August 24, 1999, plaintiff learned from Allstate that GSA issued the solicitations to Unlimited and Diamond. On September 2, 1999, plaintiff filed a bid protest before the GAO, alleging that GSA's offering to place the procurements in the 8(a) Program on a sole source, rather than competitive basis, violated several procurement regulations. The GAO dismissed plaintiff's protest after GSA awarded the contracts.

On September 24, 1999, plaintiff filed a complaint together with an application for a temporary restraining order (TRO) and a preliminary injunction, alleging GSA violated procurement statutes and regulations in awarding the contracts. Plaintiff also asserted that it would have submitted bids in the two 8(a) procurements if GSA had issued them for competitive, rather than sole source awards. Plaintiff also sought declaratory relief and a permanent injunction. In a hearing held on September 29, 1999, the court denied plaintiff's application for a TRO and preliminary injunction. On December 3, 1999, defendant filed a motion for judgment upon the administrative record, asserting GSA's decision to award the contracts on a sole source basis complied with procurement law. On March 3, 2000, plaintiff filed a cross-motion for summary judgment, asserting GSA's award violated procurement statutes and regulations and was arbitrary and capricious.

Subsequent to filing their dispositive motions, the parties filed a series of additional motions related to supplementation of the administrative record, thereby requiring further action by the court. On April 14, 2000, defendant filed a motion to exclude the entire appendix to plaintiff's cross-motion for summary judgment, alleging plaintiff relied upon materials not incorporated in the administrative record. On May 4, 2000, plaintiff filed an opposition to defendant's motion to exclude, asserting, among other things, that the appendix included documents relied upon by GSA in awarding the contracts but which GSA failed to include within the administrative record. Plaintiff also requested the court to take judicial notice of certain facts contained within its appendix. On May 16, 2000, defendant filed a reply to plaintiff's opposition to its motion to exclude, reiterating its position and disputing plaintiff's claims.

After fully realizing the poor condition of the administrative record, the court, by order dated July 24, 2000, directed defendant to file a table of contents that sufficiently identified documents contained within the administrative record. *Myers Investigative & Security Servs., Inc. v. United States,* No. 99–780, at 2 (Fed.Cl. July 24, 2000) (order directing defendant to file supplemental materials). The court also directed defendant to submit a supplemental affidavit from Mr. Pinnau, which: (1) explained the structure and contents of the administrative record, as well as the relationship of documents included therein, and; (2) restated the information attested to in his September 28, 1999 affidavit, but included citations to specific tabs and pages of the administrative record upon which he relied in making his first affidavit. *Id.* By order dated August 4, 2000, the court denied defendant's motion to exclude plaintiff's appendix in-part and granted plaintiff's motion to take judicial notice of certain materials attached to its cross-motion. *Myers Investigative & Security Servs., Inc. v. United States,* 47 Fed.Cl. 288, 297–98 (2000).

On August 4, 2000, defendant filed a table of contents to the administrative record pursuant to the court's July 24th order. Defendant also filed the affidavits of Mr. Difford, Mr. Pinnau, Ms. Cabello and Mr. Dobbs, each dated August 2, 2000. Each individual contested Ms. Dickey's aforementioned statements concerning the June 24, 1999, pre-proposal meeting. On August 15, 2000, defendant filed two additional affidavits of Mr. Pinnau and seven attachments of supporting documentation, in which Mr. Pinnau attempt-

18. *Id.* at 40.

ed to explain how he estimated the value of the two contracts. In response, plaintiff filed an opposition to defendant's August 4 and August 15, 2000 filings, stating that the submissions did not comply with the court's order and seeking sanctions. On August 30, 2000, defendant filed a reply to plaintiff's opposition, stating that its submissions complied with the court's July 24th order.[19]

## Discussion

### I. Jurisdiction

This court's bid protest jurisdiction is set forth in the Tucker Act, which provides, in pertinent part:

(b)(1) Both the Unite[d] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1) (Supp. II 1996).

Defendant argues that plaintiff lacks standing to protest the alleged exclusion of companies expressing interest in the procurements from GSA's offering letter to SBA.[20] Defendant states that if these companies were interested in the contracts, they would have protested the awards themselves, but chose not to do so. In response, plaintiff avers that it has standing to challenge GSA's illegal conduct. Plaintiff argues that had GSA provided SBA with complete and accurate information, SBA would have been required to accept the procurements for award on a competitive basis, thereby affording plaintiff the opportunity to compete.

In order to maintain standing to sue in a bid protest action, a protestor must be an "interested party." See 28 U.S.C. § 1491(b)(1); Cincom Sys., Inc. v. United States, 37 Fed.Cl. 663, 669 (1997). The Tuck-

---

**19.** In essence, defendant maintains that because the court deemed the affidavits submitted by plaintiff as evidence supplementing the administrative record, the court's order "compelled the Government to file an affidavit explaining not only the administrative record as filed, but the administrative record as supplemented by [plaintiff's] affidavits." Defendant's Reply to Plaintiff's Opposition to the Government's Notices of Filing of Affidavits Filed on 4 August and 14 August, 2000, at 3. Defendant's assertion warrants discussion.

The administrative record filed by defendant essentially amounted to a conglomeration of documents which appeared to be placed hastily into three binders. To make matters worse, the administrative record lacked a table of contents, and many of the documents included therein provided no means of identification. Additionally, the administrative record lacked an explanation of GSA's decision to award the contracts to Diamond and Unlimited. The only explanation of GSA's decision before the court was included within Mr. Pinnau's September 28, 1999 affidavit. This affidavit, while referencing parties contacted, documents received, and computations performed, failed to cite to any materials upon which he relied. Consequently, the court ordered defendant to file the materials stated in its order.

After carefully examining defendant's submissions, the court concludes that they do not comply with its July 24, 2000 order. First, the court did not direct defendant to file any affidavits from Mr. Difford, Ms. Cabello or Mr. Dobbs. Additionally, Mr. Pinnau's August 2, 2000 affidavit addresses matters beyond that stated in the court's order. Clearly, the purpose for this order was for defendant to explain to the court the organization and structure of the administrative record, in order to assist the court in its review of GSA's decisions, and not to rebut allegations raised by affidavits attached to plaintiff's cross-motion for summary judgment. Second, Mr. Pinnau's August 11 and 12, 2000 affidavits not only fail to restate the information attested to in his September 28, 1999 affidavit, but they include additional information not included in that affidavit. Moreover, they also fail to cite to the administrative record. Instead, the August 12, 2000 affidavit cites to documents which are not part of the administrative record. Some of these documents, such as invoices submitted by Diamond and Unlimited, did not exist at the time GSA reached its decision. Based upon the forgoing, the court deems these affidavits and supporting documents non-responsive, and therefore will not consider them in resolving the issues arising in this case.

**20.** Defendant first raised this argument in its opposition to plaintiff's cross-motion for summary judgment.

er Act, however, does not define the term "interested party." That term is the same term used in the statute granting protest authority to the Comptroller General. *See* 31 U.S.C. § 3551(2) (Supp IV 1998). This statute defines "interested party" as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Id.* Although the court has looked to this definition for guidance, *see Cincom Sys.,* 37 Fed.Cl. at 669–70 (applying § 3551(2)), it has recognized that this definition does not "necessarily represent the four corners of potential standing under [the Tucker Act]." *CCL, Inc. v. United States,* 39 Fed.Cl. 780, 789 (1997); *accord American Federation of Government Employees, AFL–CIO v. United States,* 46 Fed. Cl. 586, 595 (2000) ("[Tucker Act] does not limit standing to parties who meet the definition 'interested party' under [31 U.S.C. § 3551(2)]"). This court has applied a two-part test to determine whether a protestor is an interested party under the Tucker Act. *CCL,* 39 Fed.Cl. at 790. First, the party must show some connection to the procurement. *Id.* Second, the party must have an economic interest in the procurement. *Id.*

■ The court finds that plaintiff has standing to contest the alleged exclusion of interested companies from GSA's offering letter. First, plaintiff has demonstrated a connection with the procurement. Mr. Fred Myers, plaintiff's president, attested that plaintiff would have expressed an interest in competing for both procurements had it been contacted by GSA. In addition, although Mr. Pinnau attests that plaintiff did not express an interest in this procurement, he does not claim to have contacted plaintiff. Plaintiff's timely submission of a bid in the prior procurement for similar guard service supports it assertion that it would have bid upon the contracts in issue. Second, plaintiff also has demonstrated an economic interest

in the procurements. Having been denied the opportunity to submit a proposal due to defendant's alleged improper actions, plaintiff potentially lost two contract opportunities. Accordingly, the court finds that plaintiff is an interested party under section 1491(b), and therefore has standing to contest defendant's alleged improper actions.[21]

## II. Summary Judgment

Motions for judgment upon the administrative record are treated in accordance with the rules governing motions for summary judgment. RCFC 56.1; *see Nickerson v. United States,* 35 Fed.Cl. 581, 588 (1996), *aff'd,* 113 F.3d 1255 (Fed.Cir.1997). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Secretary of DHHS,* 998 F.2d 979, 982 (Fed. Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1563 (Fed.Cir.1987). Alternatively, if the moving party can show there is an absence of evidence to support the non-moving party's case, then the burden shifts to the non-moving party to proffer such evidence. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing sum-

---

**21.** In making this determination, the court is not holding that plaintiff has standing to file suit on behalf of the parties it alleges were excluded from the offering letters. As mentioned, plaintiff essentially claims that SBA would not have accepted GSA's offer had it known there were at least two eligible participants interested in performing the contracts and that the estimated value of the contracts exceeded $3 million. The court finds that plaintiff has standing to sue under these circumstances. *Accord CCL, Inc. v. United States,* 39 Fed.Cl. 780, 790 (1997) (finding plaintiff had standing to sue where it alleged it would have competed for a contract had the government publicly invited bids or requested proposals).

mary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The fact that both parties have moved for summary judgment does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987)). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States,* 33 Fed.Cl. 514, 518 (1995). It therefore does not follow that if one motion is rejected, the other is necessarily supported. *Id.* Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Corman v. United States,* 26 Cl.Ct. 1011, 1014 (1992)).

The court reviews challenged agency decisions according to the standards provided in the Administrative Procedure Act (APA), 5 U.S.C. § 706 (1994). Thus, the court must determine whether defendant's actions towards plaintiff were:

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law . . . .

5 U.S.C. § 706(2).

▆▆ When reviewing agency action, the APA requires a "thorough, probing, indepth review" to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Contracting officials may properly exercise wide discretion in their application of pro-curement regulations. *Electro–Methods, Inc. v. United States,* 7 Cl.Ct. 755, 762 (1985); *see RADVA Corp. v. United States,* 17 Cl.Ct. 812, 818 (1989), *aff'd without op.,* 914 F.2d 271 (Fed.Cir.1990). In this regard, the court cannot substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions. *CRC Marine Servs., Inc. v. United States,* 41 Fed.Cl. 66, 83 (1998). Indeed, "[t]he court should not substitute its judgment on such matters for that of the agency, but should intervene only when it is clearly determined that the agency's determinations were irrational or unreasonable." *Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983). As long as a rational basis is articulated and relevant factors are considered, the agency's action must be upheld. *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). "To have a reasoned or rational basis, there must be a rational connection between the facts established and the choice made." *Rockwell Int.'l Corp. v. United States,* 4 Cl.Ct. 1, 5 (1983) (citing *Bowman Transp., Inc.,* 419 U.S. at 285, 95 S.Ct. 438).

▆▆ In determining whether the agency has acted arbitrarily and capriciously towards plaintiff, the court must consider four factors. *Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200, 1203 (1974). Specifically, the court must determine whether: (1) there was subjective bad faith on the part of procurement officials; (2) there was not a reasonable basis for the procurement decision; (3) the procuring officials abused their discretion; and (4) pertinent statutes or regulations were violated. *Id.* at 1203–04. There is, however, "no requirement or implication . . . that each of the factors must be present in order to establish arbitrary and capricious action by the government." *Prineville,* 859 F.2d at 911. Plaintiff must demonstrate by clear and convincing evidence that defendant's actions towards it were arbitrary and capricious. *United Int'l Investigative Servs. v. United States,* 41 Fed. Cl. 312, 318 (1998) (citing *ECDC Envtl., L.C. v. United States,* 40 Fed.Cl. 236, 241 (1998)). Furthermore, "to prevail in a protest the protestor must show not only a significant

error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed. Cir.1996); *see also Central Ark. Maintenance, Inc. v. United States,* 68 F.3d 1338, 1342 (Fed.Cir.1995) (only clear and prejudicial violations warrant relief). To establish prejudice, a protestor must demonstrate that but for the alleged error, there was a substantial chance it would have received the award. *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996).

■ The scope of review of the agency's actions is limited to the administrative record developed by the agency. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). In the bid protest context, however, the court has permitted supplementation of the administrative record under limited circumstances. *Cubic Applications, Inc. v. United States,* 37 Fed. Cl. 339, 342 (1997) (citing *Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir.1989)). By order dated August 4, 2000, the court permitted plaintiff to supplement the administrative record with affidavits, market research charts, price estimates, and other documents created by GSA during the procurement process. *See Myers Investigative & Security Servs., Inc. v. United States,* 47 Fed.Cl. 288, 297–98 (2000).

Defendant argues that the ACO's decision to procure the contracts on a sole source basis is supported by the administrative record and was not contrary to law. Defendant avers that GSA did not improperly exclude the names of interested firms from its offering letters to SBA because no firms other than Unlimited and Diamond expressed an interest in performing the contracts. Defendant maintains that the contracts are requirements contracts, and thus the ACO was required by procurement regulations to estimate the total value of the contracts to determine whether they met the $3 million threshold. Defendant alleges that both Allstate's invoices and the results of its market research demonstrate that the total value of both contracts would fall below $3 million.

Accordingly, defendant asserts that the ACO's estimation of the total value of the contracts was reasonable.

Plaintiff counters that the ACO's decision to procure the contracts on a sole source basis was arbitrary and capricious and in violation of procurement law. Plaintiff argues that the ACO violated 13 C.F.R. § 124.502(c)(14) by failing to inform SBA of three companies that expressed interest in performing the contracts. Plaintiff maintains that the contracts are indefinite quantity contracts, and thus the ACO should have estimated the competitive threshold amount based upon the "maximum order amount authorized." Plaintiff asserts that the administrative record does not support the ACO's conclusion that the estimated contract values would not exceed $3 million. According to plaintiff, had SBA known that at least two eligible participants expressed interest in performing the contracts and that the anticipated value of the contracts exceeded $3 million, it would have required GSA to procure the contracts on a competitive basis pursuant to 15 U.S.C. § 637(a) and 13 C.F.R. § 124.506. Plaintiff contends that it would have submitted a bid had GSA competed the contracts. Plaintiff posits that the ACO should have placed a "sources sought synopsis" in the Commerce Business Daily (CBD) describing the procurements in order to assess possible competition.

The Small Business Act describes the circumstances under which SBA must award a contract on a competitive basis:

> (D)(i) A contract opportunity offered for award pursuant to this subsection shall be awarded on the basis of competition restricted to eligible Program Participants if—
>
>> (I) there is a reasonable expectation that at least two eligible Program Participants will submit offers and that award can be made at a fair market price, and
>>
>> (II) the anticipated award price of the contract (including options) will exceed $5,000,000 in the case of a contract opportunity assigned a standard industrial classification code for manufacturing and

$3,000,000 (including options) in the case of all other contract opportunities.

15 U.S.C. § 637(a)(1)(D) (1994). Similarly, SBA's implementing regulations provide that a contract shall be awarded on a competitive basis if the anticipated award price will exceed the applicable dollar threshold and "[t]here is a reasonable expectation that at least two eligible Participants will submit offers at a fair market price." 13 C.F.R. § 124.506(a)(1) (1999).[22]

A. Expressions of Interest in the Contracts.

Under the 8(a) Program, the contracting officer of the procuring agency is required to notify SBA by an offering letter of his/her intent to award the procurement as an 8(a) contract. 13 C.F.R. § 124.502(a) (1999). The offering letter must contain, among other things, a description of the work to be performed, the anticipated dollar value of the requirement, including any options, and the identification of all participants that have expressed an interest in being considered for the acquisition. § 124.502(c)(1), (4), (14). SBA regulations define "participant" as "a small business concern admitted to participate in the 8(a) BD program." 13 C.F.R. § 124.3 (1999).

Defendant asserts that the submission of a price estimate did not indicate an expression of interest by the respective company. Although market research sent by the ACO states that price estimates sought were nonbinding, it is clear that GSA sought price estimates to determine whether any companies were interested in performing the contracts. For example, Mr. Pinnau relies upon the results of the market survey, which includes the receipt of price estimates, to conclude that only Unlimited and Diamond expressed a timely interest in performing the contracts. We're Cleaning, Inc. submitted a price estimate on behalf of ODS to procure guard services in Ohio. Significantly, the letter states "please accept this correspondence as a letter of interest, not a proposal."[23] Additionally, the administrative rec-

ord includes duplicate copies of the price estimate of ETSA, both of which contain handwritten notes by Mr. Pinnau that state ETSA was "no longer interested" in the procurements. Based upon the forgoing, the court finds that the submission of a price estimate indicated an expression of interest in performing the contracts.

The administrative record reveals that three companies submitted price estimates for the northern procurement. Unlimited provided a price estimate for the northern procurement only, while ETSA and We're Cleaning, Inc. provided price estimates for the entire state of Ohio. As mentioned, a handwritten note on ETSA's price estimate indicated it lost interest in performing the contracts. The price estimate submitted by We're Cleaning contains a handwritten note stating "Not 8a yet? [Two] different firms— ODS not 8a."[24] This note demonstrates that ODS was not 8(a) certified and therefore was not an eligible participant as defined by 13 C.F.R. § 124.3. Accordingly, GSA had no obligation under 13 C.F.R. § 124.502(c)(14) to inform SBA of the price estimates of ODS and ETSA because neither firm met the requirement of that provision.

In contrast, three companies submitted price estimates for the southern procurement. Diamond submitted a price estimate on June 2, 1999. Digby submitted a price estimate on June 7, 1999, while NCLN20 submitted a price estimate on June 8, 1999. Although not addressed by the ACO in his affidavit, counsel for defendant asserts that Digby was not interested because it received another contract. The administrative record does not support this assertion. The page alluded to in the administrative record merely states that Digby would be awarded a guard services contract in Chicago, Illinois. It does not state that Digby lost interest. Allegations of counsel, unsupported by the record, constitute an insufficient basis on which to support summary judgment. *Chevron Chem. Corp. v. United States*, 5 Cl.Ct. 807, 810 (1984). Accordingly, the court finds that Digby did express an interest.

---

22. This regulation also includes a third requirement which is not applicable here.

23. A.R., Tab 5 at 19.

24. *Id.*

Defendant contends that NCLN20's price estimate was untimely because it was three months late and therefore was disregarded. The administrative record demonstrates that GSA sent NCLN20 a market research chart on May 25, 1999, and that NCLN20 responded two weeks later. Although the market research chart contains a note from Mr. Pinnau stating he sent similar information to NCLN20 a few weeks prior, this note does not support defendant's contention. Moreover, in his affidavit, Mr. Pinnau neither explains why NCLN20's price estimate was three months late nor cites any evidence within the administrative record to support this claim. Mr. Pinnau's conclusory allegation that NCLN20's price estimate was three months late is insufficient to establish an issue of material fact. *See Young–Montenay, Inc. v. United States,* 15 F.3d 1040, 1042–43 (1994) (conclusory and speculative affidavits do not raise an issue of fact); *Romala Corp. v. United States,* 20 Cl.Ct. 8, 13 (1990) ("[t]o counter a motion for summary judgment, specific facts, and not mere assertions of counsel or conclusory statements, must be set forth to demonstrate that a genuine issue of material fact exists") (citing *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624, 626–27 (Fed.Cir.1984)). The administrative record demonstrates that NCLN20's price estimate was timely. In sum, both Digby and NCLN20 were 8(a) certified and thus were eligible participants within the meaning of 13 C.F.R. § 124.3.[25] Therefore, the court concludes that GSA was obliged to inform SBA in its offering letter of Digby's and NCLN20's interest, and its failure to do so violated 13 C.F.R. § 124.502(c)(14).

### B. Estimation of the contracts' value

The court next addresses whether GSA's estimation of the value of the contracts was reasonable. SBA regulations provide, in pertinent part:

(a) Competitive thresholds

. . .

(2) For all types of contracts, the applicable competitive threshold amounts will be applied to the procuring activity estimate of the total value of the contract, including all options. For indefinite delivery or indefinite quantity type contracts, the thresholds are applied to the maximum order amount authorized.

13 C.F.R. § 124.506(a)(2).

■ As mentioned, the parties dispute whether the contracts are indefinite quantity or a requirements contracts. The determination of type of contract is a matter of law for the court to decide. *Maintenance Eng'rs v. United States,* 749 F.2d 724, 725 n. 3 (Fed.Cir.1984). A requirements contract "provides for filling all actual purchase requirements of designated Government activities for supplies or services during a specified contract period, with deliveries or performance to be scheduled by placing orders with the contractor." 48 C.F.R. § 16.503(a) (1999); *accord Mason v. United States,* 222 Ct.Cl. 436, 615 F.2d 1343, 1346 (1980) (defining a requirements contract as "a contract in which the purchaser agrees to buy all of its needs of a specified material from a particular supplier, and the supplier agrees, in turn, to fill all of the purchaser's needs during the period of the contract"). The buyer's agreement to purchase all of his requirements from the seller may be implicit. *See Shader Contractors, Inc. v. United States,* 149 Ct.Cl. 535, 276 F.2d 1, 4 (1960). The applicable regulation requires that the solicitation and resulting contract state the estimated total quantity of goods or services needed. § 16.503(a)(1). In addition, if feasible, the contract must include a "maximum limit of the contractor's obligation to deliver and the Government's obligation to order." § 16.503(a)(2).

■ "An indefinite-quantity contract provides for an indefinite quantity, within stated limits, of supplies or services during a fixed period." 48 C.F.R. § 16.504(a) (1999); *accord Mason,* 615 F.2d at 1346 n. 5. The contract "must require the Government to order and the contractor to furnish at least

---

**25.** *See* Pl.'s Cross-mot., Tabs K and L (demonstrating that Digby and NCLN20 were 8(a) certi-

fied at the time GSA made its decision).

a stated minimum quantity of supplies or services." § 16.504(a)(1). The solicitation and the contract must specify the total minimum and maximum quantity of supplies or services the Government will acquire under the contract. § 16.504(a)(4)(ii); *accord Crown Laundry and Dry Cleaners, Inc. v. United States,* 29 Fed.Cl. 506, 517 (1993) (*Crown Laundry*) (finding that a contract lacking a minimum quantity clause could not qualify as an indefinite quantity contract). As explained by this court's predecessor, an indefinite quantity contract "differs from a requirements contract in that under a requirements contract the buyer agrees to purchase all his requirements from the seller. Under an indefinite quantities contract, even if the buyer has requirements, he is not obligated to purchase from the seller." *Mason,* 615 F.2d at 1346 n. 5.

 Section C–1.1 of both solicitations, entitled "Introduction (The Contract)," states that defendant "intends to incorporate the contents of this solicitation and the successful Offeror's Proposal response into a requirements Contract between GSA and that Offeror."[26] That section further states that "[a] requirements or term Contract provides for filling all Government requirements for a particular service within a specified time frame. All Government-specified quantities, locations and/or time frame(s) will be as estimated in the Contract and/or as stated in Contract delivery/task orders issued subsequent to Contract award."[27] Section C–2, entitled "Scope of the Contract," provides "[t]he Contractor agrees to provide and furnish *all* Contract-required active and reserve forces of uniformed security guards (armed and unarmed) ... at the GSA-controlled and/or GSA supported areas/facilities identified within section F, at the prices stated in Section B."[28] Clearly, this section contemplates plaintiff fulfilling all of defendant's requirements. That section also states that

GSA "agrees to purchase the security services described, in accordance with this Solicitation."[29] This last section, when read together with the prior sentence and with Section C–1, imply an intent to purchase all of the contractor's services.

Other provisions within the solicitations also suggest that the contracts are requirements contracts. Federal Acquisition Regulation (FAR) section 16.503 contemplates defendant "placing orders with the contractor" for "deliveries or performance." 48 C.F.R. § 16.503. Significantly, the solicitations state:

### C–1.3 Introduction (Delivery/Task Orders)

Duty, post and schedule-specific delivery/task orders ... will be issued by GSA against the term Contract as the need for Standard and Special Service(s) arises, ends or changes. These delivery/task orders will include sufficient information for the Contractor to provide the ordered services required by the Contract.[30]

Section B of the solicitations, entitled "Supplies or Services and Prices/Costs," do not contain either a minimum or maximum quantity clause.[31] Indefinite quantity contracts must contain a minimum quantity clause. 48 C.F.R. § 16.504(a)(1); *accord Crown Laundry,* 29 Fed.Cl. at 517. Having examined the contracts as a whole, the court concludes that these are requirements, and not indefinite quantity, contracts. Therefore, the ACO was correct in using the "estimate of the total value of the contract" criterion to determine whether the contracts met the $3 million threshold. *See* 13 C.F.R. § 124.506(a)(2).

The court must next determine whether Mr. Pinnau's estimation of the total value of the contracts was reasonable based upon the information possessed by GSA at the time. It is well-established that defendant "must

---

26. A.R., Tabs 1 and 3 at 20.

27. *Id.*

28. *Id.* at 21.

29. *Id.*

30. *Id.* at 20–21.

31. The court notes that Section H of the contracts contain both a maximum dollar value clause (Section H–22) and a minimum dollar value clause (H–23). *See id.* at 141. Even assuming these sections are considered to be minimum and maximum quantity clause, this does not change the court's analysis.

act in good faith and use reasonable care in computing its estimated needs ...." *Medart v. Austin*, 967 F.2d 579, 581 (Fed.Cir. 1992). Defendant is "obliged to base [its] estimate on all relevant information that is reasonably available to it." *Womack v. United States*, 182 Ct.Cl. 399, 389 F.2d 793, 800 (1968); *see also Chemical Technology, Inc. v. United States*, 227 Ct.Cl. 120, 645 F.2d 934, 946 (1981) (finding a government estimate unreasonable because it did not take into account all relevant factual data).

As mentioned, Mr. Pinnau attests that based upon the FY 1998 and 1999 invoices and the results of GSA's market survey, he "figured that the two new contracts, each of which covered only half of Ohio and lasted only one year, would be worth less than $3 million."[32] Although not explicitly stated, it appears Mr. Pinnau simply divided the invoice amounts by two and arrived at a number which falls below $3 million. Mr. Pinnau, however, does not provide a specific number in his affidavit. This estimation was nothing more than a guess, and defendant "is not free to carelessly guess at its needs." *Medart*, 967 F.2d at 581.

Additionally, there is no evidence within the administrative record which supports the $2.5 million figure Mr. Pinnau provided to SBA. In addition, Mr. Pinnau does not explain how he arrived at this figure. He also does not correlate it with the "figure" he discusses in his affidavit. Even assuming that the number that Mr. Pinnau attests to in his affidavit is the $2.5 million figure provided to SBA, there is no evidence in the administrative record or before the court that supports this estimation.[33] Significantly, evidence before GSA at the time Mr. Pinnau estimated the value of the contracts would lead to an estimated value that exceeds $3 million. With respect to the northern procurement, Unlimited submitted a price estimate of $3,177,556, just above the competitive threshold. GSA received price estimates for the southern procurement of $2,940,119 (Diamond), $3,112,250 (Digby) and $3,513,610 (NCLN20). The average of these numbers is $3,118,659.66.

In addition to the price estimates, at least one provision in the solicitation informed the ACO that the contract value might exceed the $3 million threshold. This section provides "[t]his Contract may have a maximum dollar value of *$3 Million* for the life of the Contract, including *one* base period. This 8(a) Contract may exceed this maximum dollar value established here only as permitted by the Contracting Officer and the ... FAR."[34]

Based upon this evidence, the court concludes that there is no rational connection between facts before GSA and Mr. Pinnau's estimate of $2.5 million. GSA should have anticipated that the estimated award amount would exceed the $3 million threshold, and thus was required to hold a competitive procurement for the southern procurement.[35] GSA's failure to do so violated 15 U.S.C. § 637(a) and 13 C.F.R. § 124.506(a).[36]

32. Aff. Roger Pinnau, Def.'s Mot, Tab 1 at 3.

33. As discussed, on August 15, 2000, defendant filed two affidavits from Mr. Pinnau dated August 11 and 12, 2000, together with seven attachments of documents, in an attempt to explain GSA's decision and Mr. Pinnau's original affidavit. The court deemed these filings non-responsive to its July 26, 2000 order.

34. A.R., Tab 1 at 141; Tab 3 at 137 (emphasis in original). Defendant was not required to compete the northern procurement because only Unlimited *expressed an interest in performing the* contract. *See* 15 U.S.C. § 637(a).

35. The parties dispute whether the ACO was *required to publish notice of the procurements* under the CBD. FAR 5.205(f) provides that "[w]hen a national buy requirement is being considered for competitive acquisition limited to eligible 8(a) concerns under Subpart 19.8, the *contracting officer shall transmit a synopsis of* the proposed contract action to the CBD in accordance with 5.207." 48 C.F.R. § 5.205(f)(1999). Had GSA properly calculated the estimated contract value, it would have been required to compete the southern procurement, and thus publish a notice of the procurement in the CBD.

36. Plaintiff contends that Mr. Pinnau incrementally reduced the guard hours sought by the *solicitations in order to circumvent the $3 mil-* lion competitive threshold. This action, according to plaintiff, together with Mr. Pinnau's failure to inform SBA of interested parties, demonstrates that Mr. Pinnau acted in bad faith.

Government officials are presumed to act conscientiously and in good faith in the discharge of

## C. Prejudice

The court must next determine whether plaintiff was prejudiced by defendant's actions. Plaintiff has not explicitly alleged in its complaint or briefs that it was prejudiced. Rather, plaintiff contends it would have submitted a bid had GSA properly competed the contracts.

■ As mentioned, in order to demonstrate prejudice, plaintiff must prove that but for the alleged error, there was a substantial chance it would have received the award. *Statistica*, 102 F.3d at 1581. This standard does not require plaintiff to demonstrate it would have received the contract but for the alleged error. *Data Gen. Corp.*, 78 F.3d at 1562. Nevertheless, "a showing of a mere possibility that the protestor would have received the contract but for the error is inadequate to show prejudice." *Id.*

■ One goal of the market survey was to determine if the companies responding had the capability to perform the contracts. Assuming defendant competed the contracts and plaintiff submitted a bid, plaintiff has not demonstrated that it was prejudiced. Plaintiff has made no effort to show that it was responsible and could have performed the contracts. For example, plaintiff has not proven it had the resources or the manpower to supply the guard services sought by these contracts. In addition, plaintiff has not provided the court with any evidence demonstrating that it had been awarded or successfully performed contracts for similar services in the past.

Similarly, assuming GSA used the same technical evaluation factors and rating system found in Section M of the contracts for a competitive procurement, there is no way of determining whether GSA would have given plaintiff a passing or failing technical score. Thus, it is possible that had GSA held a competitive procurement and plaintiff submitted a bid, GSA could have found plaintiff incapable of performing the contracts. In short, plaintiff has not demonstrated that in the absence of defendant's violation of procurement law that there was a substantial chance it would have received the contracts. Accordingly, the court holds that plaintiff failed to prove by clear and convincing evidence that it was prejudiced by defendant's actions.

### Conclusion

For the above-stated reasons, the court holds that defendant violated procurement law in awarding the contract to Diamond on a sole source basis. The court, however, finds that plaintiff failed to prove it was prejudiced by defendant's actions. Accordingly, defendant's motion for judgment upon the administrative record is granted and plaintiff's cross-motion for summary judgment is denied. The Clerk is ordered to dismiss plaintiff's complaint. No costs.

IT IS SO ORDERED.

---

their duties. *Spezzaferro v. F.A.A.*, 807 F.2d 169, 173 (Fed.Cir.1986). "[I]t requires 'well-nigh irrefragable proof' to induce the court to abandon the presumption of good faith fair dealing." *Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298, 1301–02 (1976) (quoting *Knotts v. United States*, 128 Ct.Cl. 489, 121 F.Supp. 630, 631 (1954)). This standard "has been equated with evidence of some specific intent to injure the plaintiff." *Kalvar*, 543 F.2d at 1302.

Both Unlimited's initial price estimate and price proposal exceeded the $3 million threshold. Immediately prior to submitting his offering letter, Mr. Pinnau issued new market research with reduced guard service hours to Unlimited. Only after Mr. Pinnau reduced the guard hours did Unlimited's price proposal drop below the $3 million threshold. The administrative record does not explain why, and Mr. Pinnau did not address this issue in his September 28, 1999 affidavit. There also is evidence to suggest that Mr. Pinnau was concerned with exceeding the $3 million threshold in both procurements. *See e.g.*, Aff. of Sandra Dickey, Pl.'s Cross-mot., Tab F at 3, Ex. 1; A.R., Tab 7 at 1. Nevertheless, these actions do not demonstrate that defendant had a "specific intent to injure" plaintiff. Therefore, the court finds that plaintiff failed to prove the ACO acted in bad faith towards it.