CESC PLAZA LIMITED
PARTNERSHIP, et
al., Plaintiffs,

v.

The UNITED STATES, Defendant,

and

LCOR Alexandria, LLC, Intervenor.

No. 01–715C.

United States Court of Federal Claims.

Originally Filed: March 22, 2002.

Reissued: April 16, 2002.[1]

John L. Oberdorfer, Patton Boggs, LLP, Washington, D.C., for plaintiffs. With whom were Michael Schaengold, Mary Beth Bosco, Rodney Grandon, and Rand L. Allen.

Opher Shweiki, Civil Division, Commercial Litigation, with whom were Donald Kinner, Assistant Director, David M. Cohen, Director, and Robert D. McCallum, Jr., Assistant Attorney General, Department of Justice, Washington, D.C., for defendant. Michael Briskin and William Covey, Patent and Trademark Office, and Barry Segal, General Services Administration, of counsel.

Kim Sperduto, The Sperduto Law Firm, PLC, Washington, D.C., for intervenor. With whom were Marian K. Riedy and Michael J. Wade.

*OPINION*

BRUGGINK, Judge.

Pending in this bid protest is plaintiffs' motion for injunctive and declaratory relief. Also pending is defendant's motion for judgment on the administrative record. Plaintiffs contend that modifications made to a contract between the General Services Administration ("GSA") and intervenor exceeded the scope of permissible changes and that the project should have been resolicited. For reasons explained at the conclusion of oral

---

1. In accordance with the protective order in this case, publication was deferred pending the parties' review for redaction of controlled materials. Those redactions are indicated by brackets.

argument held on March 18, 2002, and as more fully set out below, we deny plaintiff's motion and grant defendant's Motion for Judgment on the Administrative Record.

## FACTUAL BACKGROUND

In November 1995, Congress granted the GSA, on behalf of the Patent and Trademark Office ("PTO"), authorization to procure a lease for up to 2,386,940 rentable square feet of office space to house the consolidated PTO in Northern Virginia. AR at 8407. The approved lease prospectus capped annual rent at $57,286,560, and the actual annual rent per rentable square foot at $24.00. Both rent caps were based on fiscal year 1996 dollars, with an annual escalation of 2.9 percent compounded to the effective date of the lease. AR at 8402. The project would constitute the largest lease ever executed by GSA.

On June 26, 1996, GSA issued Solicitation for Offers No. 96.004 ("SFO"), inviting offers to lease office space for the PTO. AR at 3651. The SFO had a two-phase selection process. Phase I was open to all potential offerors who met the minimum SFO qualifications. Phase I evaluated the quality of the proposed site, design team, and developer. AR at 3720. Once an offeror met Phase I qualifications, it was allowed to submit Phase II proposals. Offerors' technical and pricing proposals were required during Phase II. The technical proposals were evaluated by quality of site, design, interior architect, and operating and maintenance firm. AR at 3724. On November 16, 1998 four offerors submitted initial Best and Final Offers ("BAFO"). The SFO was amended fourteen times. The most far-reaching of those was Amendment Twelve. AR at 4000–50. Plaintiffs are five Charles E. Smith Companies ("CESC") which submitted a joint BAFO.

Before filing this suit, CESC lodged a pre-award bid protest in 1999 under the Competition in Contracting Act ("CICA"), claiming that the SFO was inherently prejudicial to CESC. *CESC Plaza Ltd. Partnership v. United States,* C.A. No. 98–1837 (E.D.Va. 1999), *aff'd,* 215 F.3d 1317 (4th Cir.2000). CESC was the incumbent on most of the PTO's existing leases. It argued that the SFO did not properly take into consideration its unique position as an existing building owner instead of a bidder proposing to build a new building. *Id.* slip op. at 2. The district court preliminarily enjoined the procurement until GSA provided additional information and the offerors submitted new BAFO's. *Id.* Permanent injunctive relief was denied on grounds that the SFO comported with CICA's requirements. *Id.* slip op. at 26.

On June 1, 2000, GSA awarded the lease to intervenor, LCOR Alexandria, Inc. ("LCOR"). LCOR is a single-purpose entity created for the special purpose of this project. Its assets are those that the lease transaction has generated. This lease included a provision which stated:

> The Government may terminate this Lease if, within one hundred eighty (180) working days of the date of execution of this Lease, the Lessor fails to obtain the requisite financing or fails to satisfy the other obligations set forth in Section 5.1.4 of this Lease, as such time frame may be extended by the Government pursuant to Section 5.1.5. Once such financing has been obtained and such other obligations have been satisfied and once all or any portion of the leased Premises has been substantially completed by the Lessor and has been accepted by the Government, the Government shall have no right to terminate the Space Lease portion of this Lease under any circumstances ... notwithstanding any other term or provision of this Lease to the contrary....

AR at 7058.1.

On February 2, 2001, seven months after award, LCOR advised GSA that the project costs exceeded its ability to finance the project. AR at 3104. LCOR presented GSA a list of proposed changes to the lease on March 9, 2001. The list was described by LCOR as "critical to successfully financing this project." AR at 3112. GSA entered into a new lease with LCOR on December 19, 2001, GSA Lease No. GS–11B–LVA80671. AR at 1. One of the buildings contracted for was a parking garage, although very few parking spaces were actually included in the lease. A second lease, Lease No. USPTO 01–100A, was also executed between PTO

and LCOR. It involves the separate lease of 3561 parking spaces and the office space in townhouses constructed as a facade to the parking garage structure.

## DISCUSSION

This court has jurisdiction to entertain "an action by an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement." 28 U.S.C. § 1491(b)(1) (Supp.1999). Plaintiffs allege that the government violated 41 U.S.C. § 253(a), (b) (1994) and various Federal Acquisition Regulations by modifying the original lease between LCOR and GSA so that the parties circumvented the statutory requirement of competition.

To have standing to bring a bid protest, plaintiffs must be interested parties. "Interested parties" are defined as "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *American Fed'n of Gov't Employees, et al. v. United States*, 258 F.3d 1294, 1302 (Fed.Cir.2001) (citing 31 U.S.C. § 3551(2) (1994)). *See also Myers Investigative and Sec. Serv., Inc. v. United States*, 275 F.3d 1366, 1370–71 (Fed.Cir.2002) (stating that a contractor must "show that it would have been a qualified bidder.") Plaintiffs were finalists in the competition for the lease under the original SFO and would presumably have bid again if the lease had been resolicited. We are satisfied plaintiffs have standing.

■ CICA demands "full and open competition through the use of competitive procedures." 41 U.S.C. § 253(a)(1)(A). This requirement should not be avoided by using the device of a contract modification. *See AT & T Communications v. Wiltel, Inc.*, 1 F.3d 1201, 1204 (Fed.Cir.1993); *CCL, Inc. v. United States*, 39 Fed.Cl. 780, 791(1997). Modifying the contract so that it materially departs from the scope of the original procurement violates CICA by preventing potential bidders from participating or competing for what should be a new procurement. *See AT & T*, 1 F.3d at 1204; *VMC Behavioral Healthcare Serv. v. United States*, 50 Fed.Cl. 328 (2001); *CCL*, 39 Fed.Cl. at 791; *Graphic-*

*Data, LLC v. United States*, 37 Fed.Cl. 771, 781–82 (1997). It is to be noted, however, that CICA "does not prevent modification of a contract by requiring a new bid procedure for every change." *AT & T*, 1 F.3d at 1205.

To determine whether a modification is within the scope of the original solicitation the court must compare the modified contract with the scope of the competition conducted to achieve the original contract. *See id.* Several factors may be considered. The court should look to see "whether the modification is of a nature which potential offerors would reasonably have anticipated." *AT & T*, 1 F.3d at 1204. Since this inquiry is viewed from the perspective of potential bidders, it is primarily an objective one. *CCL*, 39 Fed.Cl. at 791. Another factor is whether the modification substantially changes "the type of work, performance period, and costs as between the original contract and modified contract." *CCL*, 39 Fed.Cl. at 791 (citing *MCI Telecomm. Corp.*, 97–2 C.P.D. ¶ 90, 1997 WL 602194, at *6 (Sept. 29, 1997)).

■ Plaintiffs complain that the amended lease between GSA and LCOR violates CICA by procuring a lease without the necessary competition or findings excusing competition. Plaintiffs do not argue that alteration of the end-product places the modifications outside the scope. PTO still will be consolidated on a campus in Northern Virginia with a twenty year lease for the premises. Instead they allege that modifications made by the amended lease increase the cash flow to LCOR and shift the risk of payment and performance to the government beyond what was permitted by the SFO. Plaintiffs argue that the changes allow LCOR to finance the construction of the buildings in a way which gives it advantages not available to other bidders.

Plaintiffs are not alleging a typical modification bid protest. Typically a third-party plaintiff in a bid protest involving a modification argues that a new addition to the contract is so far outside the scope of the solicitation that the government in effect granted a sole source contract. If the court agrees, it may remedy the CICA violation by carving the modification out of the contract and requiring that the work be solicited as a sepa-

rate contract. In the case at bar, plaintiffs are not asking that changes be removed and separately solicited. Plaintiffs are asking that we reopen the entire procurement.

Plaintiffs argue that the sum of the changes materially alters the contract, not that the specific changes themselves are out of scope modifications. Plaintiffs must prove that the amount of increased cash flow and the magnitude of the shift in the risk of payment and performance, if any, created by the changes found in the amended lease, are materially outside the scope of the SFO and that these modifications were not foreseeable to the bidders.

*Modifications*

A. Cash Flow

The Congressionally-approved prospectus capped annual rent at $57,286,560, and the actual annual rent per rentable square foot at $24.00, both based on fiscal year 1996 dollars, with an annual escalation of 2.9 percent compounded to the effective date of the lease. AR at 8402. Plaintiffs argue that six specific changes to the GSA/LCOR Lease add significantly to the cash flow features which together exceed the SFO's mandated rent cap.

1. Base Rent Increase

Plaintiffs complain that the amended lease increases the base rental rate between GSA and LCOR. The SFO stated that GSA would evaluate offers regarding price on "the basis of the annual price per occupiable square foot during the initial Lease term." AR at 3673. The original contract between GSA and LCOR fixed the rent at $27.89 rent per square foot. AR at 7081. The amended contract sets the rent at $28.36 rent per square foot. AR at 27. The net increase is 1.7 percent, however, which is less than the allowable 2.9 percent annual escalation. LCOR will receive annual rent of

$67,693,618.40. Int. Rec. at 86. Defendant claims that the increase was necessary due to changes LCOR incorporated as mandated by the City of Alexandria[2] and the increased costs of construction. Defendant also points out that in return for the increased rent, it receives a lowered option renewal rate. The rate for the first 10–year extension term was lowered from $35.3799 per rentable square foot to $34.3799 per rentable square foot; the rent for the first 5–year extension term remained the same at $35.3799 per rentable square foot; and the rate for the second 5–year extension was lowered from $37.6744 per rentable square foot to $35.3799 per rentable square foot. *Compare* AR at 7400[3] *with* AR at 30. The adjustment in price per rentable square foot does not exceed the rent cap nor is the increase beyond the scope of the SFO. Furthermore, the government receives consideration for the increase.

2. Square Footage Increase

Plaintiffs claim that the square footage amount has been increased beyond the prospectus limit by using a different measurement technique, specifically the inclusion of the parking and office space under a separate PTO lease with LCOR. The SFO specified that GSA wanted to lease up to 2,386,940 rentable square feet, and that the space must yield 1,989,116 occupiable square feet. AR at 3668–69. The original GSA/LCOR contract was for 2,235,164 rentable square feet which yielded (subject to final measurements) 1,989,116 occupiable square feet. AR at 7081–82. The contract also included a clause that stated "[i]n no event shall the Government be obligated to use, occupy or pay for rentable square footage in excess of 2,386,940 rentable square feet." *Id.* The amended lease is for 2,235,164 rentable square feet with 1,989,116 square feet occupiable, with the same clause limiting the amount square footage that the government

2. LCOR was required to submerge a pedestrian walkway that was originally planned for the surface and build a townhouse facade on a parking garage.

3. The June 1, 2000 lease contained errors in Section 2.3.2. AR at 7083. Section 2.3.2 conflicts with the Rent Schedule which states LCOR's offered rates in annual terms (as re-

quired by the SFO). AR at 3979. Therefore, per rentable square foot rates are derived from a calculation: 10–year extension term is $79,079,879 annually/2,235,164 rentable square feet ("RSF")=$35.3799; first 5–year extension option is $79,079,879 annually/RSF=$35.3799; and the second 5–year extension option is $84,208,463 annually/RSF=$37.6744.

would pay for. AR at 27–29. Plaintiffs claim that the square footage added by the PTO/LCOR lease for the parking spaces and townhouse office space should be counted in the calculation as part of the GSA/LCOR lease that is subject to the rent cap. Although the PTO lease is separate from the GSA lease, plaintiffs contend that this is an artificial separation. The SFO called for the availability of the empty parking facility, and the reservation of only twenty-five spaces for PTO use. It also contemplated that the Lessor would lease the remaining spaces to PTO employees. Plaintiffs' concern is that, by executing a separate lease for the space, the original lease is effectively expanded beyond the limited square footage.

We disagree. The SFO creates the possibility of a separate lease with the winning bidder. The PTO is an entity separate from GSA. The court cannot force into one contract two individual acquisitions. The fact that they involve the same physical space is insufficient basis for overturning the agencies' procurement practices.

### 3. LCOR's Receipt of $6,000,000 Per Year for Parking

Plaintiffs claim that LCOR's contract with PTO for the lease of the parking garage and office townhouses has added $6,000,000 to the cash flow of LCOR. The SFO stated that:

> The Lessor shall provide, within the rental rate, 25 parking spaces reserved for the Government. In addition, the Lessor shall provide and distribute among all offered buildings parking, to be paid for separately by the individual parking users, in an amount sufficient to meet the needs of PTO employees and visitors and satisfying all local requirements. This additional parking shall include, in any event, between 3,500 and 7,000 parking spaces, depending upon the site's distance from an operating Metrorail station.

AR at 3652. The SFO also states that "[i]f there is a charge for parking, the PTO's employees and visitors will pay individually for the number of such parking spaces actually used." AR at 3670.

The original lease and amended lease state that there will be "reserved parking spaces for twenty-five (25) vehicles, all to be located on that certain parcel of real property." AR at 7081, 27. Regarding the townhouses, the original lease and amended lease state that "[l]essor shall have the right at its sole cost and expense to construct 3–story office townhouses along John Carlyle Street and Elizabeth Lane backing up on the parking garages (and without direct access to such parking garages) and to lease such office townhouses to third-party tenants." AR at 7082. In neither contract does the GSA pay for the parking of all employees or visitors. Instead, PTO has entered into a separate lease to rent 3.561 parking spaces and the 77,000 rentable square feet of office space in the townhouses. The PTO parking/townhouse lease is for one year with 29 one-year options. The annual rent received by LCOR from PTO for parking and townhouses will be $6,558,040.08. The base rent portion of that amount is subject to a 3.5 percent annual escalation. AR at 1154, 1157. LCOR would expect to receive rental income for the use of this space, either from PTO or its employees. The guarantee of rental income is created by the PTO lease. It is therefore not a material change to the GSA/LCOR lease.

### 4. Real Estate Tax

Plaintiffs allege that the amended lease enhanced the guarantee of payment by the government of real estate taxes. The SFO required that:

> As to each building holding a portion of the Leased premises, the Government shall make annual lump sum payments to cover its share of increases in real estate taxes over the arithmetic mean (*"Base Year"*) of (i) taxes paid for the calendar year during which the Building Lease Commencement Date (as defined in Section D.7) for that building occurs or, if no full tax assessment is made during the calendar year in which the Building Lease Commencement Date occurs, taxes paid during the first calendar year of a full assessment, *plus* (ii) taxes paid for that building during the next succeeding calendar year.

AR at 3693. The SFO thus made the rental rate inclusive of all taxes, with the exception

of any amount over the base year of real estate taxes. GSA was to contribute an uncertain amount, to be defined after occupancy, by calculating an averaged base tax amount, and paying the excess, if any, over that amount. *Id.* The original lease mirrors the SFO's language regarding taxes. The amended lease, however, states:

2.6.1 In addition to the payment of the annual Rent called for under this Lease, commencing with the first fiscal real estate tax year following the Commencement Date for which all Buildings are fully assessed for real estate tax purposes . . . , the Government shall be responsible to reimburse the Lessor for one hundred percent (100%) of all real estate taxes actually paid by Lessor with respect to the Leases Premises in excess of an agreed initial annual base amount of $5,071,214.

. . . .

2.6.3 If the real estate taxes for the aggregate Base Year as determined pursuant to Section 2.6.4 below exceed $5,071,214, the Government will continue to pay the full amount of the increase over $5,071,214 in accordance with the procedure set forth above, but the amount of difference between $5,071,214 and the real estate taxes for the Base Year shall accrue each year for the remaining Lease Term together with interest at six percent (6%) per annum until either: (i) the Project Financing has been repaid in full, or (ii) the term of this Lease including any Extension Term(s) elected by the Government shall have expired, at which time the Government shall be entitled to receive a rent-free Lease Term extension in accordance with Section 5.7.11 below.

AR at 41–42.

Unlike the SFO and original lease, in which the base amount of taxes was to be determined following completion and occupancy of the buildings, the amended lease thus fixes the base amount for tax escalation purposes at $5,071,214. AR at 41–43. It eliminates uncertainty, but this is the tax amount that LCOR projected in its final revised proposal and which was included in the original lease. AR at 7382. To the extent that the "base" rate for taxes under

the original lease would have been greater than the $5,071,214 agreed to in the amended lease, this difference will be carried forward over the term of the lease and accrue interest for the government at 9 percent per annum. AR at 42. This is not a material change. The government's obligation to pay real estate taxes above a base amount existed in the SFOR. The difference is that under the amended lease there is a certain dollar amount applied. The government somewhat protected itself by requiring that LCOR pay interest on the difference between the $5,071,214 amount and the actual aggregate Base Year and by fixing the base at a reasonable level.

5. Up Front Cash Contribution

Plaintiffs claim that LCOR is receiving a new up front cash contribution from GSA in the amount of $29 million. This is something of an exaggeration. The SFO (as amended by "Amendment Number Twelve") describes Fit–Out allowances. It stated:

a. For improvements under $5,000.000.00, the Government shall pay a lump sum.

b. For improvements over $5,000,000.00, the Government may pay lump sum or may amortize the cost of the improvements through a corresponding adjustment in the rental rate . . . .

c. Government funding for Fit–Out in excess of the Fit–Out Allowance shall be limited to $29,000,000.00.

AR at 4002. The SFO stated that it would be possible for the government to make its Fit–Out allowances, in excess $5,000,000.00 in either lump sum or amortized payments and that the sum should not be more than $29,000,000.

The original lease language was the same except the last paragraph stated:

(c) Government funding for initial Fit–Out in excess of the Fit–Out Allowance shall be limited to Twenty–Nine Million and No/100 Dollars ($29,000,000.00) ("*Above GSA–Standard Fit–Out Sums*") and shall be paid lump sum.

AR at 7102.

The amended lease states:

c. Government funding for initial Fit–Out in excess of the Fit–Out Allowance shall be limited to Twenty–Nine Million and No/100 Dollars ($29,000,000.00) (*"Above GSA–Standard Fit–Out Sums"*) and shall be paid lump sum to the Lessor's Lender or Master Servicer at the time of the Financial Closing. Such funds shall thereafter be treated as part of the Fit–Out Allowance for all purposes of this Lease, except for Section 6.1.1 below.

AR at 48. The amended lease is admittedly different in that the lump sum payment will be made at the time of Financial Closing. It in effect sets a definite time for the payment of the $29,000,000. The $29,000,000 is to be placed in escrow, however. LCOR will only be able to draw the money by presentment of actual fit-out expenses to the Trustee. AR at 48, 9725; Int. Rec. at 753, 754, 1318. In exchange for use of the interest on the $29,000,000, LCOR agreed to reduce its supervision and management fee related to construction and supervision of the fit-out work from 6.5 percent to five percent. AR at 388,7400, 9725.

As with most other changes, this one leaves the contract basically unaffected. What is different is that, in exchange for some predictability in cash flow to LCOR, GSA extracted some minor concessions. The change, in itself, cannot be considered beyond the scope of the SFO or the original contract.

### 6. Design Changes

Plaintiffs allege that the amended lease includes design changes that equal a cost savings to LCOR of $30 to $60 million. Unfortunately plaintiffs do not point to any specific design changes that they allege are beyond the scope of the SFO or original contract. To support this allegation plaintiffs point to two documents. The first is a document titled "PTO Status and Strategy" dated February 1, 2001 and written by Rick Hendrick, Project Manager. AR at 10221–22. [ ]AR at 10222. The second is a letter dated April 5, 2001 from Craig King, a government consultant. [ ]AR at 10177. [ ] *Id.* [ ] *Id.* [ ] *Id.*

These citations do not support a finding of a fundamental change to the work. Design changes which leave the end product basically the same are uniquely matters of contract administration. The fact that changes were proposed to the buildings for the purpose of saving money is not proof that a material change in the amended lease occurred or that the design changes were outside of the SFO. Moreover, the government's internal assessment about potential changes, particularly during what amounted to negotiations, is not conclusive.

### B. Shift of Risk of Performance and/or Payment

Independently, none of the items above constitute fundamental alterations to what was originally solicited. Plaintiffs argue, however, that these six changes, along with others discussed below, when considered as a whole, gave LCOR a critical advantage in terms of the cost of its financing. This was done, allegedly, by shifting the payment risk to the government. The government and LCOR respond that any change made by the amended lease was in exchange for an amount of consideration that mitigates any potential shift of the risk of performance and/or payment.

### 1. Fixed Rent Start Date

Plaintiffs claim that the amended lease's fixed rent start date was initially prohibited. The SFO, after the addition of Amendment Twelve, states:

> [T]he Government shall have no obligation to occupy and/or commence paying rent on any portion of the Leased premises prior to October 1, 2001 ... The Government shall commence paying rent for a Stage within Block 1 upon the Government's acceptance of each such Stage; ... no such rent for any Stage within Block 1 shall be payable ... if within twenty weeks after the Government's acceptance of the first Stage in Block 1, all remaining portions of Block 1 have not been delivered to and accepted by the Government ...

AR at 4008, *see also* AR at 4000. The original lease states:

5.7.9. Building Lease Commencement/Lease Commencement. The *"Building Lease Commencement Date"* for a particular Building shall mean the composite weighted average of the dates of space acceptances made by the Government in a particular Building, as indicated in the Government's written acceptance of each Stage. The Contracting Officer shall compute, subject to the reasonable approval of Lessor, the composite weighted average by taking into account the date of space acceptance by the Government and the percentage of space delivered in a given Stage or group of Stages in a particular Building relative to the total space to be leased by the Government in such Building. However, if a Government delay occurs in a given Stage, then the acceptance date used to compute the composite weighted average shall be the same number of calendar days earlier than the actual acceptance date as the number of calendar days of Government Delay. Additionally, if Lessor Delay occurs in a given Stage, then the date used to compute the composite weighted average will be the actual acceptance date and the Government shall have the right to seek those damages described in Section 5.7.11.

AR at 7129. These clauses provide for a phased acceptance of space and for payment of rent to commence on a phased basis. After the government's acceptance of the final block of space, the Lease Commencement Date was to be established as the weighted average delivery date for all blocks of space. AR at 4008, 7129. The amended lease, on the other hand, states:

5.7.9. Commencement. The term of this Lease and the payment of the Rent reserved hereunder for the entire Leased Premises shall commence 978 days after the Financial Closing (the "Commencement Date"). The Commencement Date shall be confirmed by a Supplemental Lease Agreement to be executed by the Lessor and the Government concurrent with the Financial Closing and shall not be subject to any condition subsequent, including, but not limited to the completion or availability of all or any portion of the Leased Premises for Government use and occupancy.

AR at 75. The date for rent commencement is August 24, 2004. This start date is based on the delivery schedule contained in the original lease, however, and reflects LCOR's current contract with its general contractor, Turner Construction Company. AR at 8225; Int. Rec. at 2747. There are also benefits that the government receives in the amended lease. Approximately 729,500 square feet will be delivered prior to the rent start date for use by the PTO before paying rent. AR at 9721–9723. Also, in the event that delivery of the project is delayed, the amended lease offers GSA a new remedy. "[T]he Contracting Officer may elect in his discretion to withhold an amount from the Service Agreement Rent equal to the government's cost (including all administrative overhead), as estimated by the Contracting Officer or his designee, to correct or complete the Leased Premises so as to bring them into complete compliance with Lease requirements." AR at 184. LCOR has pledged a portion of its development fee to GSA, worth the equivalent of forty-five days of base rent in the event that delivery of the project is delayed. AR at 56, 76, 9721; Int. Rec. at 323, 754.

These exchanges may not constitute a perfect quid pro quo. The amended lease, for example, only says that at the Contracting Officer's discretion, he may withhold payment to LCOR, and it does not state what amount may be withheld. But the government received other concessions. For example, GSA received an assignment of LCOR's right to collect liquidated damages against Turner Construction Company. AR at 76. *See also* Int. Rec. at 2565–66 (contract between Turner and LCOR [     ]). The government will also receive four free days of rent following the retirement of the project financing for every one day of rent it had to pay without occupancy. AR at 76. In sum, while the fixed rent start date is new, the other changes negotiated by the government mitigate any shift in the burden of performance and payment.

### 2. Unconditional Obligation to Pay Rent

The next allegation is that the amended lease makes the government's obligation to

pay rent unconditional for the first time and that there are no termination or withholding rights for late delivery. The original lease stated:

> Except in the event of a fire or other casualty as specifically provided by the terms of this Lease, the Government may neither terminate the Space Lease portion of this Lease nor set off, reduce or terminate the Base Rent once the Contracting Officer has accepted the Leased Premises, or any portion thereof, in writing.

AR at 7102. In the amended lease, the relevant clause states that:

> Except in the event of a fire or other casualty as specifically provided by the terms of this Lease, once the Financial Closing has occurred, the Government may neither terminate the Space Lease portion of this Lease nor set off, abate, suspend, reduce or terminate the Base Rent or any portion thereof for any reason, including without limitation, an breach by Lessor of its obligation under this Lease.

AR at 48–49. The net change is that the date the non-interruptibility of Base Rent becomes binding was moved from the point at which the Contracting Officer accepted the leased premises to the date of financial closing. This does not mean that rent would begin to be paid at financial closing or at acceptance of the premises, but that these actions would trigger the non-interruptibility of Base Rent. This change is not material not does it shift a burden to the government that did not previously exist.

3. Minimum Renewal Rent Rate and Option to Purchase

Plaintiffs claim that the amended lease impermissibly changes the minimum renewal rent rate and guarantees a minimum option purchase price. With respect to the rental rate extensions, the SFO stated that bidders should include a figure for fixed rental rates for one 10–year and two 5–year options. AR at 3676. The government, when exercising the option would pay either the fixed rental rate or a percentage of the fair market rental rate at the time. *Id.* The original lease set the fixed rental rate $35.3799 for 10–year

extension or 95% of Fair Annual Rent; $35.3799 for the first 5–year extension or 95% of Fair Annual Rent; and $37.6744 for the second 5–year extension or 90% of Fair Annual Rent. AR at 7083, 7400.[4]

The amended lease states that:

> [T]he applicable Extension Term will be, (i) for the Extension Options applicable to years 21–30 of the Lease Term, the fixed rental rate ("*Fixed Rental Rate*") set forth below on a per rentable square foot basis or (ii) for the Extension Options applicable to years 31–40 of the Lease Term, ninety-five percent (95%) of the then-current market rental rate ("*Fair Annual Rent*") at the beginning of such term, as such Fair Annual Rent is determined in accordance with appraisal procedure described below.

AR at 30. The amended lease sets out the fixed rental rate as follows: $34.3799 for the 10–year extension term; $35.3799 for the first 5–year extension term; and $35.3799 for the second 5–year extension term. *Id.* The amended lease provides that at GSA's option, it can "extend the Initial Term for up to two (2) additional periods of ten (10) years each ..., or three (3) additional periods of five (5) years each." AR at 29. This change gives the government the option to extend the lease for up to forty years, as opposed to the SFO's option for 30 years.

The purchase option after twenty and thirty years at a fixed purchase price or 100% of fair market value existed in the SFO. AR at 3680. The original lease also set the purchase option as either a fixed purchase price ($821,330,253 after twenty years or $985,596,304 after thirty years) or 100% of fair market value. AR at 7088. The amended lease also states that the purchase option is available at either the fixed purchase price ($830,330,253 after twenty years or $975,546,304 after thirty years) or 100% of fair market value. AR at 34. But, the amended lease adds that "in no event shall such purchase price be less that $489,323,000." *Id.* This is a little over one-half the actual anticipated full value at that time. In consideration for the added minimum purchase price, moreover, LCOR

---

4. *See supra* fn. 2.

agreed to reduce its fixed purchase option prices by $20 million for the 20–year purchase option and $50 million for the 30–year purchase option.[5] *See* AR at 9543. Not only are these changes within scope, but the government's assessment that they do not fundamentally shift the parties' respective financial positions is reasonable.

### 4. Real Estate Tax

Plaintiffs allege that the amended lease impermissibly guarantees payment by the government of real estate taxes. Plaintiffs make the same argument regarding the alleged change in cash flow, *supra*. We are not persuaded that the change with respect to real estate taxes places the change outside the scope of the solicitation, when considered in light of what appears to be a fair exchange which GSA received.

### 5. Parking Garage and Townhouse Lease

Plaintiffs allege that LCOR is receiving additional rent from the parking garage which impermissibly shifts further the risk of payment away from the contractor. We have explained above, however, why this separate lease should not be considered when assessing changes to the SFO.

*Analysis*

We find that these changes, individually or collectively, are not outside the scope of the SFO. The SFO's scope of competition was broad and it is reasonable that changes between the final lease and SFO would develop.

*AT & T*, 1 F.3d at 1205 ("Thus a broad original competition may validate a broader range of later modifications without further bid procedures."). Although the amended lease contains some provisions not contemplated by the SFO, these modifications do not improperly change the cash flow in any significant amount, nor do they impermissibly shift the payment/performance obligations. The most that plaintiffs can argue is that the financing terms have been altered in a way that eliminates some uncertainty of payment, thereby allowing LCOR to obtain cheaper financing. These changes, even viewed as a whole, would have only affected those bidders whose proposals were inhibited by debt constraints.[6] But in this respect there is not a radical departure from the SFO. It did not require any particular type of financing and even asked for a description of any non-traditional sources, including securitized bond financing. AR at 3703. Amendment Twelve also included a "Further Assurances" clause which states that:

> The Government shall cooperate with the Lessor and the Lessor's Lender to make such additional changes to this Lease as may be required to facilitate the project financing to the extent such requested changes do not alter the Lessor's obligations, do not increase the costs to the Government and are otherwise consistent with the purpose and intent of this Lease as reasonably determined by the Government.

**5.** The City of Alexandria required LCOR to add a townhouse facade to a parking garage and the GSA agreed to increase the purchase option prices to $855,330,253 and $1,025,546,304. AR at 9727. In consideration for agreeing to the minimum purchase option price, LCOR agreed to reduce its fixed purchase option prices by $20 million for the 20–year purchase option and $50 million for the 30–year purchase option. AR at 34.

**6.** Plaintiffs rely on *Old Stone Leasing v. United States*, GSBCA No. 10613–P, Jul. 2, 1990, 90–3 BCA ¶ 23084, 1990 WL 92744, as an example of changes to financing that were viewed as modifications outside the scope of a solicitation. In *Old Stone Leasing*, the protester alleged that the agency's modification of the contract was prohibited by the terms of the solicitation. The underlying contract involved the " 'sale/leaseback' and 'refinancing' of existing agency leases of personal

property." *Id.* The protestor claimed that two modifications "redefined the scope of work and altered the basic pricing structure of the contract" and "expanded the applicability of the contract to leases entered into by the agency after contract award." *Id.* The board found that the shift in the payment provision and amount of capital altered the risk of the contractor so that the contract was impermissibly modified. *Id.* The facts are readily extinguishable, however. In *Old Stone Leasing*, the type work to be performed was a financial package. In the present case, the type work to be performed is a lease for a building to house PTO. The financing behind the construction of the building is not what the government procured. Although the financing was of interest to GSA, it was not the purpose of the solicitation. The solicitation did not require a specific type of financing.

AR at 4050. Given the these provisions, the potential for changes to accommodate securitized bond financing cannot be characterized as surprising from the perspective of other bidders.

Plaintiffs point to the fact that some of the modifications ultimately included in the amended lease were the subject of question and answer during the bidding period. These included the right to offset rent in case of Lessor default, separating parking from the base lease, providing guaranteed lease start date, waiving lease termination rights, and restricting or eliminating the government's right to offset rent in the case of a default. AR at 3905, 3929. The mere fact of a denial of a change, by itself does not mean that they were unforeseeable. *See AT & T*, 1 F.3d at 1206. Yet plaintiffs' concern is relevant-the fact that a change is specifically rejected establishes that it was not within the four corners of the solicitation. But it also has the ironic effect of making it difficult to establish a disconnect between the scope of what was contemplated and the scope of the contract as amended. In other words, the change was sufficiently close in association to prompt an inquiry.

In order to grant injunctive relief plaintiffs must establish: "(1) actual success on the merits; (2) that it will suffer irreparable injury if injunctive relief were not granted; (3) that, if the injunction were not granted, the harm to plaintiff outweighs the harm to the government and third parties; and (4) that granting the injunction serves the public interests." *Interstate Rock Products, Inc. v. United States,* 50 Fed.Cl. 349, 354 (2001). Injunctive relief is inappropriate here because the plaintiffs did not prove the merits of their claim. Moreover, even assuming plaintiffs establish a violation of law, there is no question that the fourth element is not satisfied. The overwhelming public interest here is in avoiding further delay in this project. The PTO consolidation has been on the drawing board for over seven years. Resolicitation would send this entire project back to the drawing board.

---

* This opinion is being reissued for publication. The opinion of February 28, 2002 was filed un-

## CONCLUSION

Plaintiffs' consolidated motion for injunctive and declaratory relief is denied and defendant's motion for judgment on the administrative record is granted. Defendant's motion to supplement the administrative record is granted. Clerk is ordered to enter judgment accordingly.